# SECRETARY OF STATE OF MARYLAND *v.* JOSEPH H. MUNSON CO., INC.

No. 82–766.   Argued October 31, 1983—Decided June 26, 1984

948

*Diana G. Motz*, Assistant Attorney General of Maryland, argued the cause for petitioner. With her on the briefs were *Stephen H. Sachs*, Attorney General, and *James G. Klair* and *Robert A. Zarnoch*, Assistant Attorneys General.

*Yale L. Goldberg* argued the cause for respondent. With him on the brief was *Donald E. Sinrod*.*

JUSTICE BLACKMUN delivered the opinion of the Court.

In *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620 (1980), this Court, with one dissenting vote, concluded that a municipal ordinance prohibiting the solicitation of contributions by a charitable organization that did not use at least 75% of its receipts for "charitable purposes" was unconstitutionally overbroad in violation of the First and Fourteenth Amendments. The issue in the present case is whether a Maryland statute with a like percentage limitation, but with provisions that render it more "flexible" than the

---

*A brief of *amici curiae* urging reversal was filed for the State of Connecticut et al. by *Francis X. Bellotti*, Attorney General of Massachusetts, and *Catharine W. Hantzis, Leslie G. Espinoza*, and *Dana L. Mason*, Assistant Attorneys General, *Joseph I. Lieberman*, Attorney General of Connecticut, *Neil F. Hartigan*, Attorney General of Illinois, *Robert T. Stephan*, Attorney General of Kansas, *Irwin I. Kimmelman*, Attorney General of New Jersey, *Robert Abrams*, Attorney General of New York, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *Mark Meierhenry*, Attorney General of South Dakota, and *William M. Leech, Jr.*, Attorney General of Tennessee.

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Robert B. Hummel, Thomas J. McGrew, Charles S. Sims*, and *Arthur B. Spitzer;* for Independent Sector et al. by *Adam Yarmolinsky, Stephen T. Owen*, and *Michael B. Jennison;* and for Box Office, Inc., by *Barry A. Fisher, Robert C. Moest*, and *David Grosz*.

*Schaumburg* ordinance, can withstand constitutional attack. The Court of Appeals of Maryland concluded that, even with this increased flexibility, the percentage restriction on charitable solicitation was an unconstitutional limitation on protected First Amendment solicitation activity. We agree with that conclusion and affirm the judgment of the Court of Appeals.

## I

Joseph H. Munson Co., Inc. (Munson), an Indiana corporation, instituted this action in the Circuit Court for Anne Arundel County, Md., seeking declaratory and injunctive relief against the Secretary of State of Maryland (Secretary). Munson is a professional for-profit fundraiser in the business of promoting fundraising events and giving advice to customers on how those events should be conducted. Its Maryland customers include various chapters of the Fraternal Order of Police (FOP).

Section 103A *et seq.*, Art. 41, Md. Ann. Code (1982),[1] concern charitable organizations. Section 103D prohibits such an organization, in connection with any fundraising activity, from paying or agreeing to pay as expenses more than 25% of the amount raised.[2] Munson in its complaint alleged that it

---

[1] Effective July 1, 1984, the Maryland Legislature has revised its charitable organizations law. See 1984 Md. Laws, ch. 787. No changes are made in § 103D, but changes are made in the definitional section and in the registration requirement imposed on professional fundraisers. Those changes do not affect this case.

[2] Section § 103D reads in full:

"(a) A charitable organization other than a charitable salvage organization may not pay or agree to pay as expenses in connection with any fundraising activity a total amount in excess of 25 percent of the total gross income raised or received by reason of the fund-raising activity. The Secretary of State shall, by rule or regulation in accordance with the 'standard of accounting and fiscal reporting for voluntary health and welfare organizations' provide for the reporting of actual cost, and of allocation of expenses, of a charitable organization into those which are in connection with a fund-raising activity and those which are not. The Secretary of State shall issue rules and regulations to permit a charitable organization to pay

regularly charges an FOP chapter an amount in excess of 25% of the gross raised for the event it promotes. App. 4. Munson also alleged that the Secretary had informed it that it was subject to § 103D and would be prosecuted if it failed to comply with the provisions of that statute. App. 5.

In its initial complaint, filed March 7, 1978, Munson took the position that its contracts with the FOP should not be subject to § 103A *et seq.* The Circuit Court dismissed that challenge for failure to exhaust administrative remedies. The court concluded, however, that Munson could attack the statutes as an improper delegation of legislative authority, in

or agree to pay for expenses in connection with a fund-raising activity more than 25% of its total gross income in those instances where the 25% limitation would effectively prevent the charitable organization from raising contributions.

"The 25% limitation in this subsection shall not apply to compensation or expenses paid by a charitable organization to a professional fund-raiser counsel for conducting feasibility studies for the purpose of determining whether or not the charitable organization should undertake a fund-raising activity, such compensation or expenses paid for feasibility studies or preliminary planning not being considered to be expenses paid in connection with a fund-raising activity.

"(b) For purposes of this section, the total gross income raised or received shall be adjusted so as not to include contributions received equal to the actual cost to the charitable organization of (1) goods, food, entertainment, or drink sold or provided to the public, nor should these costs be included as fund-raising costs; (2) the actual postage paid to the United States Postal Service and printing expense in connection with the soliciting of contributions, nor should these costs be included as fund-raising costs.

"(c) Every contract or agreement between a professional fund-raiser counsel or a professional solicitor and a charitable organization shall be in writing, and a copy of it shall be filed with the Secretary of State within ten days after it is entered into and prior to any solicitations."

Other related Maryland statutes require that a charity intending to solicit contributions within or without the State file a registration statement with the Secretary of State providing information about its purpose and its finances, § 103B, and that professional fundraisers register with and be approved by the Secretary, § 103F. Section 103L(a) subjects both the charitable organization and the professional fundraiser to criminal liability for wilfully violating the statutory requirements.

violation of the Maryland Constitution. App. 13. Munson then amended its complaint to allege that the statutes effected an unconstitutional infringement on its right to free speech and assembly under the First and Fourteenth Amendments of the United States Constitution. *Id.*, at 26.

The Secretary questioned Munson's standing to assert its claims. He urged that § 103D is directed to acts of charitable organizations and, therefore, that only an organization of that kind can challenge the statute's constitutionality. The Secretary also urged that Munson's claims presented no actual controversy, because Munson had failed to exhaust its administrative remedies and, consequently, there had been no binding determination that the statute would apply to Munson's contracts. App. 29.

The Circuit Court did not address the standing argument, but upheld the statute on the merits. App. to Pet. for Cert. 38a. It concluded that because the statute included a provision authorizing a waiver of the percentage limitation "in those instances where the 25% limitation would effectively prevent a charitable organization from raising contributions," it was sufficiently flexible to accommodate legitimate First Amendment interests. *Id.*, at 46a. The court also rejected Munson's state-law claim that the statute was an impermissible delegation of legislative authority.

Munson appealed to the Court of Special Appeals of Maryland. The Secretary did not take a cross-appeal. The Court of Special Appeals affirmed the judgment of the Circuit Court. 48 Md. App. 273, 426 A. 2d 985 (1981).

Both Munson and the Secretary then petitioned the Court of Appeals of Maryland for writs of certiorari. Munson challenged the validity of the statute and the Secretary challenged Munson's standing. The court granted both petitions and, by a unanimous vote, reversed the judgment of the Court of Special Appeals. 294 Md. 160, 448 A. 2d 935 (1982). It expressed doubt about the Secretary's ability to challenge Munson's standing when the Secretary had not taken an appeal from the Circuit Court's judgment, but, assuming that

the issue was properly before the court, nonetheless concluded that Munson did have standing to challenge the facial validity of § 103D. The court found that, based on the allegations of its complaint and under the facts as stipulated in the trial court, see App. to Pet. for Cert. 39a, Munson clearly had suffered injury as a result of § 103D.[3] The court rejected the contention that Munson may not assert the First Amendment rights of the FOP chapters, noting that where a statute is directed at persons with whom the plaintiff has a business or professional relationship, and impairs the plaintiff in that relationship, it normally is accorded standing to challenge the validity of the statute. 294 Md., at 171, 448 A. 2d, at 941. In addition, as this Court in *Schaumburg* held, 444 U. S., at 634, "[g]iven a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." 294 Md., at 172, 448 A. 2d, at 942.

On the merits, the court concluded that *Schaumburg* required that the Maryland statute be ruled unconstitutional. It rejected the Secretary's argument that the statute was valid because it did not require a permit prior to solicitation, and imposed criminal penalties only for solicitation in violation of the statute. 294 Md., at 176–179, 448 A. 2d, at 944–945. The court also concluded that the flaws in the statute were not remedied by the provision authorizing a waiver of the 25% limitation whenever it would effectively prevent the charitable organization from raising contributions. *Id.*, at 179–181, 448 A. 2d, at 945–946. The court found that the statutory authorization for an exemption from the percentage limitation is "extremely narrow." It did not remedy the flaw

---

[3] The court also rejected the Secretary's claim that Munson could not question the validity of the statute because there had been no final administrative determination that the statute was applicable to Munson. The court concluded that Munson did not need to exhaust administrative remedies in order to attack the statute on its face. 294 Md., at 171, 448 A. 2d, at 941. The Secretary does not challenge that determination here.

inherent in a percentage limitation on solicitation costs—that charities that make a policy decision to use more than 25% of the proceeds raised for purposes other than "charitable" are denied their constitutional right to do so, and are lumped together with those engaging in fraud. *Id.*, at 180–181, 448 A. 2d, at 946. In sum, in the view of the Court of Appeals, the 25% limitation, like that in the ordinance addressed in *Schaumburg*, is not a "narrowly drawn regulatio[n] designed to serve [the State's legitimate] interests without unnecessarily interfering with First Amendment freedoms." 444 U. S., at 637.

We granted certiorari to review both determinations of the Court of Appeals, namely, that Munson had standing to challenge the validity of § 103D, and that the statute was unconstitutional on its face. 459 U. S. 1102 (1983).

## II

*Standing.* The first element of the standing inquiry that Munson must satisfy in this Court is the "case" or "controversy" requirement of Art. III of the United States Constitution. *Singleton* v. *Wulff*, 428 U. S. 106, 112 (1976).[4] Munson is a professional fundraising company. Because its contracts call for payment in excess of 25% of the funds raised for a given event, it is subject, under § 103L, to civil restraint and criminal liability. Prior to initiation of the present lawsuit, the Secretary informed Munson that if it refused to comply with § 103D, it would be prosecuted. The parties stipulated before trial that the Montgomery County Chapter of the FOP was reluctant to enter into a contract with Munson because of the limitation imposed by § 103D. Munson has

---

[4] The Court of Appeals concluded that Munson had suffered sufficient injury as a result of § 103D to have standing to challenge the statute. The Secretary does not dispute that determination. Nevertheless, because the "case" or "controversy" requirement is jurisdictional here, we must satisfy ourselves that the requirements of Art. III are met. *Doremus* v. *Board of Education*, 342 U. S. 429, 434 (1952).

suffered both threatened and actual injury as a result of the statute. See *Singleton* v. *Wulff, supra; Simon* v. *Eastern Kentucky Welfare Rights Organization,* 426 U. S. 26 (1976); *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973).

In addition to the limitations on standing imposed by Art. III's case-or-controversy requirement, there are prudential considerations that limit the challenges courts are willing to hear. "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth* v. *Seldin,* 422 U. S. 490, 499 (1975) (citing *Tileston* v. *Ullman,* 318 U. S. 44 (1943); *United States* v. *Raines,* 362 U. S. 17 (1960); and *Barrows* v. *Jackson,* 346 U. S. 249 (1953)). The reason for this rule is twofold. The limitation "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy," *United States* v. *Raines,* 362 U. S., at 22, and it assures the court that the issues before it will be concrete and sharply presented.[5] See *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). Munson is not a charity and does not claim that its own First Amendment rights have been or will be infringed by the challenged statute.[6] Accordingly, the Secretary insists that

---

[5] As the various formulations of the prudential-standing limitations illustrate, the second factor counseling against allowing a litigant to assert the rights of third parties is not completely separable from Art. III's requirement that a plaintiff have a "sufficiently concrete interest in the outcome of [the] suit to make it a case or controversy." *Singleton* v. *Wulff,* 428 U. S. 106, 112 (1976). The prudential limitations add to the constitutional minima a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the claim not be an abstract, generalized grievance that the courts are neither well equipped nor well advised to adjudicate. See *Warth* v. *Seldin,* 422 U. S. 490, 500 (1975); *Schlesinger* v. *Reservists To Stop the War,* 418 U. S. 208, 217–222 (1974).

[6] In the Circuit Court, Munson claimed that § 103D intruded upon its own First Amendment rights. Now, however, it focuses its argument solely on its ability to assert the First Amendment rights of Maryland char-

Munson should not be heard to complain that the State's charitable-solicitation rule violates the First Amendment.

The Secretary concedes, however, that there are situations where competing considerations outweigh any prudential rationale against third-party standing, and that this Court has relaxed the prudential-standing limitation when such concerns are present. Where practical obstacles prevent a party from asserting rights on behalf of itself, for example, the Court has recognized the doctrine of *jus tertii* standing. In such a situation, the Court considers whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement, and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal. See, *e. g., Craig* v. *Boren,* 429 U. S. 190, 193–194 (1976).

Within the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing. Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption

---

ities. Because of our disposition of the Secretary's standing challenge, we have no occasion to address the extent to which Munson might assert its own First Amendment right to disseminate information as part of a charitable solicitation. It is clear that the fact that Munson is paid to disseminate information does not in itself render its activity unprotected. See *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 266 (1964).

that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 612 (1973).[7]

In the instant case, the Secretary's most serious argument against allowing Munson to challenge the statute is that there is no showing that a charity cannot bring its own lawsuit. Although such an argument might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech. To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and " 'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " *Broadrick* v. *Oklahoma,* 413 U. S., at 612, quoting *Dombrowski* v. *Pfister,* 380 U. S. 479, 486 (1965). See also *Schaumburg,* 444 U. S., at 634 ("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substan-

---

[7] See also *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 380 (1977) ("The use of overbreadth analysis reflects the conclusion that the possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted"); *Eisenstadt* v. *Baird,* 405 U. S. 438, 445 (1972) (in determining whether a litigant should be able to assert third-party rights, a crucial factor is "the impact of the litigation on the third-party interests"); *id.,* at 445, n. 5 ("Indeed, in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech. *E. g., Thornhill* v. *Alabama,* 310 U. S. 88, 97–98 (1940). See *United States* v. *Raines,* 362 U. S. 17, 22 (1960)").

tially abridges the First Amendment rights of other parties not before the court").

The fact that, because Munson is not a charity, there might not be a possibility that the challenged statute could restrict Munson's own First Amendment rights does not alter the analysis. Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court. Munson's ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake. The crucial issues are whether Munson satisfies the requirement of "injury-in-fact," and whether it can be expected satisfactorily to frame the issues in the case. If so, there is no reason that Munson need also be a charity. If not, Munson could not bring this challenge even if it were a charity.

The Secretary concedes that the Art. III case-or-controversy requirement has been met, see Tr. of Oral Arg. 5, and the Secretary has come forward with no reason why Munson is an inadequate advocate to assert the charities' rights. The activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents. We see no prudential reason not to allow it to challenge the statute.

Besides challenging Munson's standing as a "noncharity" to bring its claim, the Secretary urges that Munson should not have standing to challenge the statute as overbroad because it has not demonstrated that the statute's overbreadth is "substantial." See Broadrick v. Oklahoma, 413 U. S., at 615. The Secretary raises a point of valid concern. The Court has indicated that application of the overbreadth doctrine is "strong medicine" that should be invoked only "as a last resort." Id., at 613. The Secretary's concern, however, is one that is more properly reserved for the determina-

tion of Munson's First Amendment challenge on the merits. The requirement that a statute be "substantially overbroad" before it will be struck down on its face is a "standing" question only to the extent that if the plaintiff does not prevail on the merits of its facial challenge and cannot demonstrate that, as applied to it, the statute is unconstitutional, it has no "standing" to allege that, as applied to others, the statute might be unconstitutional. See *Parker* v. *Levy*, 417 U. S. 733, 760 (1974); *United States* v. *Raines*, 362 U. S., at 21. See generally Monaghan, Overbreadth, 1981 S. Ct. Rev. 1. We therefore move on to the merits of Munson's First Amendment claim.

## III

*The Merits.* In *Schaumburg* v. *Citizens for a Better Environment, supra,* the Court struck down a municipal ordinance that required every charitable organization, which utilized door-to-door solicitation, to apply for a permit obtainable only on " '[s]atisfactory proof that at least seventy-five per cent of the proceeds of such solicitations will be used directly for the charitable purpose of the organization.' " *Id.,* at 624. The question before us is whether the distinctions between the Schaumburg ordinance and the Maryland statute are sufficient to render the statute constitutionally acceptable. To answer that question, we reexamine the bases for the conclusion the Court reached in *Schaumburg.*

## A

The Court in *Schaumburg* determined first that charitable solicitations are so intertwined with speech that they are entitled to the protections of the First Amendment:

> "Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Solicit-

ing financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Id.*, at 632.[8]

Because the percentage limitation restricted the ways in which charities might engage in solicitation activity, the Court concluded that it was a "direct and substantial limitation on protected activity that cannot be sustained unless it

---

[8] The types of speech regulated by the Maryland statute clearly encompass the types of speech determined in *Schaumburg* to be entitled to First Amendment protection. The statute defines "solicit" as meaning

"to request, directly or indirectly, money, credit, property, a credit card contribution . . . or other financial assistance in any form on the plea or representation that the money, credit, property, a credit card contribution . . . or other financial assistance will be used for a charitable purpose. It includes:

"(1) An oral or written request;

"(2) An announcement to the news media for further dissemination by it of an appeal or campaign seeking contributions from the public for one or more charitable purposes.

"(3) The distribution, circulation, posting, or publishing of any handbill, written advertisement, or other publication which, directly or by implication, seeks contributions by the public for one or more charitable purposes; and

"(4) The sale of, or offer or attempt to sell, any advertisement, advertising space, book card, tag, coupon, device, magazine, membership, subscription, ticket, admission, chance, merchandise, or other tangible item in connection with which (i) an appeal is made for contributions to one or more charitable purposes, or (ii) the name of a charitable organization is used or referred to as an inducement to make such a purchase, or (iii) a statement is made that the whole or any part of the proceeds from the sale is to be used for one or more charitable purposes. A solicitation is deemed to have taken place when the request is made, whether or not the person making it actually receives a contribution." § 103A(i).

serves a sufficiently strong, subordinating interest that the Village is entitled to protect." *Id.*, at 636. In addition, in order to be valid, the limitation would have to be a "narrowly drawn regulatio[n] designed to serve [the] interes[t] without unnecessarily interfering with First Amendment freedoms." *Id.*, at 637.

Although the Court in *Schaumburg* recognized that the Village had legitimate interests in protecting the public from fraud, crime, and undue annoyance, it rejected the limitation because it was not a precisely tailored means of accommodating those interests. The Village's asserted interests were only peripherally promoted by the limitation and could be served by measures less intrusive than a direct prohibition on solicitation.

In particular, although the Village's primary interest was in preventing fraud, the Court concluded that the limitation was simply too imprecise an instrument to accomplish that purpose. The justification for the limitation was an assumption that any organization using more than 25% of its receipts on fundraising, salaries, and overhead was not charitable, but was a commercial, for-profit enterprise. Any such enterprise that represented itself as a charity thus was fraudulent.

The flaw in the Village's assumption, as the Court recognized, was that there is no necessary connection between fraud and high solicitation and administrative costs. A number of other factors may result in high costs; the most important of these is that charities often are combining solicitation with dissemination of information, discussion, and advocacy of public issues, an activity clearly protected by the First Amendment and as to which the Village had asserted no legitimate interest in prohibiting. In light of the fact that the interest in protecting against fraud can be accommodated by measures less intrusive than a direct prohibition on solicitation,[9] the Court concluded that the limitation was

---

[9] The Court noted, for instance, that the Village could punish fraud directly and could require disclosure of the finances of a charitable orga-

insufficiently related to the governmental interests asserted to justify its interference with protected speech.[10]

## B

*Schaumburg* left open the primary question now before this Court—whether the constitutional deficiencies in a percentage limitation on funds expended in solicitation are remedied by the possibility of an administrative waiver of the limitation for a charity that can demonstrate financial necessity. The Court there distinguished a case in which a percentage limitation on solicitation costs had been upheld, see *National Foundation* v. *Fort Worth*, 415 F. 2d 41 (CA5 1969), cert. denied, 396 U. S. 1040 (1970), noting that under the ordinance in *Fort Worth*, a charity had the opportunity to demonstrate that its solicitation costs, though high, nevertheless were reasonable. See 444 U. S., at 635, n. 9.

Section 103D has a provision similar to that in the Fort Worth ordinance. It directs the Secretary of State to "issue rules and regulations to permit a charitable organization to pay or agree to pay for expenses in connection with a fund-raising activity more than 25% of its total gross income in those instances where the 25% limitation would effectively prevent the charitable organization from raising contributions." See n. 2, *supra*. Having now considered the question left open in *Schaumburg*, however, we conclude that the waiver provision does not save the statute.

The Court of Appeals concluded that the exception in § 103D was "extremely narrow," being confined to instances "where the 25% limitation would effectively prevent the char-

---

nization so that a member of the public could make an informed decision about whether to contribute. *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S., at 637–638.

[10] The Court also found little connection between the percentage limitation and the protection of public safety or residential privacy. Both goals were better furthered by provisions addressed directly to the asserted interest—such as a prohibition on the use of convicted felons as solicitors and a provision allowing homeowners to post signs barring solicitors from their property. *Id.,* at 638–639.

itable organization from raising contributions," 294 Md., at 180, 448 A. 2d, at 946, and of no avail to an organization whose high fundraising costs were attributable to legitimate policy decisions about how to use its funds, rather than to inability to raise funds. Under the Court of Appeals' interpretation, the Secretary has no discretion to determine that reasons other than financial necessity warrant a waiver. The statute does not help the charity whose solicitation costs are high because it chooses, as was stipulated here, see App. to Pet. for Cert. 39a, to disseminate information as a part of its fundraising. Thus, the organizations that were of primary concern to the Court in *Schaumburg*, those whose high costs were due to " 'information dissemination, discussion, and advocacy of public issues,' " [11] 444 U. S., at 635, quoting from

---

[11] The regulations make clear that public education activity is included in the solicitation costs regulated by the 25% limitation. Section 01.02.04.04A(3) of the Code of Maryland Regulations (1983) provides: "The expenses of public education materials and activities, which include an appeal, specific or implied, for financial support, shall be fully allocated to fund-raising expenses."

In light of the clarity of the regulation and the absence of any indication by the State that the regulation is not consistent with the statute, we can only wonder at the basis for the dissent's conclusion that § 103D(a) appears to call for a pro rata allocation between advocacy and fundraising expenses, with advocacy and education expenses exempted from the statute's reach. The statute itself gives no indication that such an exemption is envisioned. It imposes a cap on "expenses in connection with any fund-raising activity" and includes within that activity "[t]he distribution, circulation, posting, or publishing of any handbill, written advertisement, or other publication which, directly or by implication, seeks contributions by the public for one or more charitable purposes." See nn. 2 and 8, *supra*. And the State's own highest court, interpreting the reach of § 103D, apparently found no basis for a presumption that advocacy and education expenses would be exempted. In any event, while the notion of a pro rata allocation sounds appealing, it ignores the "reality," recognized by the Court in *Schaumburg*, that solicitation is intertwined with protected speech. See 444 U. S., at 632. Written materials, for example, no doubt serve both purposes. A public official would have to be charged with the responsibility of determining how expenses should be allocated, which publications should be licensed, and which restricted by the statute. See n. 12, *infra*.

*Citizens for a Better Environment* v. *Schaumburg*, 590 F. 2d 220, 225 (CA7 1978), remain barred by the statute from carrying on those protected First Amendment activities.[12]

## C

The Secretary urges that even though there may remain charities whose First Amendment activity is limited by the statute, we should not strike down the statute on its face because, with the waiver provision, it no longer is "substantially overbroad." We are not persuaded.

"Substantial overbreadth" is a criterion the Court has invoked to avoid striking down a statute on its face simply because of the possibility that it might be applied in an unconstitutional manner. It is appropriate in cases where, despite some possibly impermissible application, the "'remainder of

___

[12] The Secretary disagrees with the Court of Appeals' interpretation of the scope of her discretion. She urges that she has discretion to grant a waiver "whenever necessary" and that she has done so "in an extremely liberal manner, with special care shown for the rights of advocacy groups." Brief for Petitioner 33. We have no reason to second-guess the Court of Appeals' interpretation of its own state law. But even if the Secretary were correct, and the waiver provision were broad enough to allow for exemptions "whenever necessary," we would find the statute only slightly less troubling. Our cases make clear that a statute that requires such a "license" for the dissemination of ideas is inherently suspect. By placing discretion in the hands of an official to grant or deny a license, such a statute creates a threat of censorship that by its very existence chills free speech. See *Thornhill* v. *Alabama*, 310 U. S. 88, 97 (1940); *Schneider* v. *State*, 308 U. S. 147 (1939); *Lovell* v. *Griffin*, 303 U. S. 444, 451 (1938). See also *Schaumburg*, 444 U. S., at 640–643 (dissenting opinion). Under the Secretary's interpretation, charities whose First Amendment rights are abridged by the fundraising limitation simply would have traded a direct prohibition on their activity for a licensing scheme that, if it is available to them at all, is available only at the unguided discretion of the Secretary of State. Particularly where the percentage limitation itself is so poorly suited to accomplishing the State's goal, and where there are alternative means to serve the same purpose, there is little justification for straining to salvage the statute by invoking the possibility of official dispensation to engage in protected activity.

the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct . . . .' *CSC* v. *Letter Carriers,* 413 U. S. 548, 580–581 (1973)." *Parker* v. *Levy,* 417 U. S., at 760. See also *New York* v. *Ferber,* 458 U. S. 747, 770, n. 25 (1982). In such a case, the Court has required a litigant to demonstrate that the statute "as applied" to him is unconstitutional. *Id.,* at 774.

This is not such a case.[13] Here there is no core of easily identifiable and constitutionally proscribable conduct that the

---

[13] The dissenters suggest that striking down the Maryland statute on its face is a radical departure from the Court's practice and that it is done only in overbreadth cases. *Post,* at 977–978. But as the Court recognized earlier this Term, legislation repeatedly has been struck down "on its face" because it was apparent that any application of the legislation "would create an unacceptable risk of the suppression of ideas." *City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U. S. 789, 797 (1984). See, *e. g., Stromberg* v. *California,* 283 U. S. 359 (1931); *Lovell* v. *Griffin,* 303 U. S. 444 (1938). See also *New York* v. *Ferber,* 458 U. S. 747, 768, n. 21 (1982); *Freedman* v. *Maryland,* 380 U. S. 51 (1965); *Teitel Film Corp* v. *Cusack,* 390 U. S. 139 (1968); *Saia* v. *New York,* 334 U. S. 558 (1948); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940); *Schneider* v. *State,* 308 U. S. 147 (1939); *Hague* v. *CIO,* 307 U. S. 496, 516 (1939) (plurality opinion). In those cases a litigant has claimed that his own activity was protected by the First Amendment, and the Court has not limited itself to refining the law by preventing improper applications on a case-by-case basis. Facial challenges also have been upheld in contexts other than the First Amendment. See, *e. g., Kolender* v. *Lawson,* 461 U. S. 352 (1983); *Smith* v. *Goguen,* 415 U. S. 566 (1974) (vagueness challenge to criminal statute); *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337 (1969)(due process challenge to garnishment statute); *Lanzetta* v. *New Jersey,* 306 U. S. 451 (1939) (vagueness challenge to criminal statute). In addition, though the dissenters are loath to admit it, the State's highest court has had an opportunity to construe the statute to avoid constitutional infirmities and has been unable to do so. Cf. *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 216 (1975).

The dissenters appear to overlook the fact that "overbreadth" is not used only to describe the doctrine that allows a litigant whose own conduct is unprotected to assert the rights of third parties to challenge a statute, even though "as applied" to him the statute would be constitutional. *E. g., New York* v. *Ferber, supra.* "Overbreadth" has also been used to describe a challenge to a statute that in all its applications directly restricts

statute prohibits. While there no doubt are organizations that have high fundraising costs not due to protected First Amendment activity and that, therefore, should not be heard to complain that their activities are prohibited, this statute cannot distinguish those organizations from charities that have high costs due to protected First Amendment activities. The flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud.[14] That the statute in some of its applications actually prevents the misdirection of funds from the organization's purported charitable goal is little more than fortu-

protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest. *Schaumburg*, 444 U. S., at 637–639; *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786 (1978); *Zwickler* v. *Koota*, 389 U. S. 241, 250 (1967). Cf. *City Council of Los Angeles* v. *Taxpayers for Vincent, supra* (recognizing the validity of a facial challenge but suggesting that it should not be called "overbreadth"); *Central Hudson Gas & Electric Corp* v. *Public Service Comm'n of N. Y.*, 447 U. S. 557, 565, n. 8 (1980) (same).

It was on the basis of the latter failing that the Court in *Schaumburg* struck down the Village ordinance as unconstitutional. Whether that challenge should be called "overbreadth" or simply a "facial" challenge, the point is that there is no reason to limit challenges to case-by-case "as applied" challenges when the statute on its face and therefore in all its applications falls short of constitutional demands. The dissenters' efforts to chip away at the possibly impermissible applications of the statute do nothing to address the failing that the *Schaumburg* Court found dispositive—that a percentage limitation on fundraising unnecessarily restricts protected First Amendment activity.

[14] The state legislature's announced purpose in enacting the 1976 revision of the charitable organization provisions of Md. Ann. Code, Art. 41, was to "assure that contributions will be used to benefit the intended purpose." Preamble to 1976 Md. Laws, ch. 679. The State's justification therefore may be read as an interest in preventing mismanagement as well as fraud. The flaw in the statute, however, remains. The percentage limitation is too imprecise a tool to achieve that purpose.

itous.[15]   It is equally likely that the statute will restrict First Amendment activity that results in high costs but is itself a part of the charity's goal or that is simply attributable to the fact that the charity's cause proves to be unpopular.   On the other hand, if an organization indulges in fraud, there is nothing in the percentage limitation that prevents it from misdirecting funds.   In either event, the percentage limitation, though restricting solicitation costs, will have done nothing to prevent fraud.

Where, as here, a statute imposes a direct restriction on protected First Amendment activity,[16] and where the defect

[15] The Secretary's own records illustrate the tenuous connection between low fundraising costs and a valid charitable endeavor.   Between October 14, 1980, and June 29, 1982, the Secretary apparently granted 13 of 16 applications for exemption from the 25% limitation.   The lowest one contemplated fundraising costs of 48% of receipts.   Five were between 70% and 77.1%.   Another five were between 80% and 85%.   Five of the applications granted were from lodges of the FOP; their solicitors were other than Munson.   Exhibits to Brief for Petitioner A.6.

[16] The dissenters' suggestion that, because the Maryland statute regulates only the economic relationship between charities and professional fundraisers, it is not a direct restriction on the charities' First Amendment activity is perplexing.   *Post*, at 978–980.   Any restriction on the amount of money a charity can pay to a third party as a fundraising expense could be labeled "economic regulation."   The fact that paid solicitors are used to disseminate information did not alter the *Schaumburg* Court's conclusion that a limitation on the amount a charity can spend in fundraising activity is a direct restriction on the charity's First Amendment rights.   See 444 U. S., at 635–636.   Whatever the State's purpose in enacting the statute, the fact remains that the percentage limitation is a direct restriction on the amount of money a charity can spend on fundraising activity.

For similar reasons, it is the dissent that "simply misses the point" when it urges that there is an element of "fraud" in a professional fundraiser's soliciting money for a charity if a high proportion of those funds are expended in fundraising.   *Post*, at 980, and n. 2.   The point of the *Schaumburg* Court's conclusion that the percentage limitation was not an accurate measure of fraud was that the charity's "purpose" may include public education.   It is no more fraudulent for a charity to pay a professional fundraiser to engage in legitimate public educational activity than it is for the

in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack. *Schaumburg*, 444 U. S., at 637; *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786 (1978). See also *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 557, 565, n. 8 (1980); *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 800, n. 19 (1984) ("[W]here the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack," citing *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205, 217 (1975)).

The possibility of a waiver may decrease the number of impermissible applications of the statute, but it does nothing to remedy the statute's fundamental defect. We conclude that, regardless of the waiver provision, *Schaumburg* requires that the percentage limitation in the Maryland statute be rejected.

## IV

Our conclusion is not altered by the presence of other distinctions the Secretary urges between this statute and the ordinance at issue in *Schaumburg*.

The Secretary points out, for example, that § 103D does not impose a prior restraint on protected activities. An organization may register as a charity and solicit funds without first demonstrating that it satisfies § 103D. The statute, it is said, regulates only after the fact. We are unmoved by the claimed distinction. As the Court of Appeals noted, several elements of the regulatory scheme suggest the possibil-

---

charity to engage in that activity itself. And concerns about unscrupulous professional fundraisers, like concerns about fraudulent charities, can and are accommodated directly, through disclosure and registration requirements and penalties for fraudulent conduct.

ity of a "before-the-fact" prohibition on solicitation. Section § 103D requires that every contract or agreement between a professional fundraiser and a charitable organization shall be filed with the Secretary of State prior to any solicitation. Under § 103F, no solicitation may begin until the Secretary "shall approve the registration" of a professional fundraiser counsel or professional solicitor. And the Secretary is to approve the professional fundraiser's registration only if she finds that the application is in conformity with the requirements of the subtitle as well as the rules and regulations of the Secretary.

More important, whether the statute regulates before- or after-the-fact makes little difference in this case. Whether the charity is prevented from engaging in First Amendment activity by the lack of a solicitation permit or by the knowledge that its fundraising activity is illegal if it cannot satisfy the percentage limitation, the chill on the protected activity is the same. See *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572, n. 3 (1942).

The Secretary also points out that § 103D restricts only fundraising expenses and not the multitude of other expenses that are not spent directly on the organization's charitable purpose, and that the charity may elect whether to be bound by its fundraising percentage for the prior year or to apply the 25% limitation on a campaign-by-campaign basis. Those distinctions, however, mean only that the statute will not apply to as many charities as did the ordinance in *Schaumburg*. They do nothing to alter the fact that significant fundraising activity protected by the First Amendment is barred by the percentage limitation.

Finally, the fact that the statute regulates all charitable fundraising, and not just door-to-door solicitation, does not remedy the fact that the statute promotes the State's interest only peripherally. The distinction made in *Schaumburg* was between regulation aimed at fraud and regulation aimed at something else in the hope that it would sweep fraud in

during the process. The statute's aim is not improved by the fact that it fires at a number of targets.

We agree with the Court of Appeals of Maryland that § 103D is unconstitutionally overbroad. The judgment of that court therefore is affirmed.

*It is so ordered.*

JUSTICE STEVENS, concurring.

With increasing frequency this Court seems prone to disregard the important distinctions between cases that come to us from the highest court of a State and those that arise in the federal system. The discussion of standing by the majority and the dissent illustrates the point.

What may loosely be described as the "standing" issue in this case actually encompasses three distinct questions: (1) Is the dispute between the Secretary of State of Maryland and Munson Co. a "case" or "controversy" within the meaning of Art. III of the United States Constitution; (2) are there "prudential reasons" for refusing to allow Munson to base its claim for relief on the fact that the statute is unconstitutional as it applies to the company's potential clients; and (3) is this a proper case for overbreadth analysis? The fact that this case comes to us from the Court of Appeals of Maryland is of critical significance with respect to the first two issues, but is of less importance with respect to the third. The three separate questions, however, clearly merit separate discussion.

## I

Respondent unquestionably has "standing" in a jurisdictional sense. The Court appears to be unanimous on the "case" or "controversy" issue.[1] The case-or-controversy requirement, of course, relates only to the jurisdiction of this

---

[1] Since the dissent does not argue that Munson lacks Art. III standing, the ode to Art. III in the dissenting opinion would seem to be totally gratuitous in what the dissent apparently agrees is a "case or controversy." The dissent does not express the opinion that the writ of certiorari should be dismissed for want of jurisdiction.

Court and has no bearing on the jurisdiction of the Maryland courts. Nothing in Art. III of the Federal Constitution prevents the Maryland Court of Appeals from rendering an advisory opinion concerning the constitutionality of Maryland legislation if it considers it appropriate to do so.[2] Thus, the decision of the Maryland Court of Appeals that it had jurisdiction to decide this case is one we have no power to review.

If we were persuaded that there is no Art. III "standing" in this case, we would have a duty to dismiss the writ of certiorari and allow the judgment of the Maryland Court of Appeals to remain in effect. No Member of the Court, however, argues that we must follow that course. Since every Member of the Court has expressed an opinion concerning the constitutionality of the Maryland law, it is difficult to perceive the relevance of the fact that the Framers of Art. III of the Federal Constitution elected not to give the federal judiciary a "roving commission" to render advisory opinions. *Post*, at 976.[3] In all events, there is little real dispute concerning standing in the jurisdictional sense.

---

[2] Indeed, the Maryland Court of Appeals' discussion of standing in this case indicates it is unclear whether the issue of standing may be waived under the Maryland practice, see 294 Md. 160, 168–170, 448 A. 2d 935, 940–941 (1982), and hence suggests that the Maryland courts may be willing to render advisory opinions.

[3] At the outset of the dissenting opinion we are reminded that federal courts have no "roving commission" to survey the statute books and pass judgments on laws prematurely, and that "[m]usings" regarding the constitutionality of "hypothetical" statutes "may be fitting for the classroom and the statehouse, but they are neither wise nor permissible in the courtroom." *Post*, at 976. While there is a case or controversy concerning the validity of § 103D, which makes it a crime for a charity to pay more than 25% of the receipts from a fundraising activity on expenses, there is no case or controversy concerning a Maryland statute which "regulated only the rates charged by professional fundraisers to charitable organizations," *post*, at 981—no such Maryland statute exists. The dissent, ignoring the wisdom espoused early in its opinion, provides us with an advisory opinion on such a hypothetical statute: "The statute would be clearly constitutional." *Ibid.*

## II

Whether respondent has "standing" to assert the constitutional rights of its potential customers is not a jurisdictional issue. As the Court correctly notes, in addition to the constitutional contraints on this Court's jurisdiction, this Court has "developed, for its own governance in the cases confessedly within its jurisidiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." *Ashwander* v. *TVA*, 297 U. S. 288, 346 (1936) (Brandeis, J., concurring). We may require federal courts to follow those rules, but we have no power to impose them on state courts.

Thus, the rule that a litigant generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights and interests of third parties, see *ante*, at 955, *post*, at 977, is a judge made rule. Rules of that kind that we fashion for our own governance, or indeed in the exercise of our supervisory powers over other federal judges, are not necessarily applicable to the work of state judges. Those judges may, of course, elect to follow our example, but there is no reason why they must do so. Instead, I believe they are free to adopt prudential standing rules that differ from ours—and surely they may allow more latitude for third-party attacks on state laws than we might consider appropriate.

In this case, even if we might deny a fundraiser prudential standing to attack a statute on the basis of its impact on a charity in a case arising in a declaratory judgment action in federal court, the state court was perfectly willing to hear such a challenge to the Maryland statute. If we should conclude in this case that we are unwilling to listen to Munson's arguments about the impact of the Maryland statute on the rights of its clients, it surely does not follow that we can deny the Maryland Court of Appeals the power to decide that it will listen to those arguments. Thus, it seems quite clear to me that our analysis of the prudential standing issue should serve only the function of determining whether this case is

one that is appropriate for the exercise of our discretionary certiorari jurisdiction.[4]

If, as the dissent implies,[5] Munson is not a proper party to advance a constitutional challenge to a statute of this type, then surely we should not review a judgment of the state court that was based on that party's arguments. In that event, the proper course would be a dismissal of the writ as having been improvidently granted.

In my opinion, while the writ of certiorari should have never issued in this case, there are sufficient reasons for finding that Munson's "third-party" standing is proper as a prudential matter that the writ does not need to be dismissed as improvidently granted. Whether a particular litigant has a sufficiently significant stake in the outcome of a constitutional challenge to a statute based on its application to individuals not before the court to render him an appropriate party to make the challenge on their behalf is a question of the degree of his interest and the nature of the relationship between him and the individuals whose rights are allegedly infringed.

Munson has been threatened with criminal sanctions under the statute, but Munson does not contend that its own First Amendment rights are violated by that threat. The fact of that threat is relevant, however, to assessing whether Munson is a proper party to litigate the constitutional ques-

---

[4] It is revealing that the dissent cites a major abstention case, *Younger* v. *Harris*, 401 U. S. 37 (1971), at the outset of its opinion discussing judicial review. *Post*, at 976. The hodgepodge of concerns expressed by the dissent with respect to entertaining this case were sound reasons for this Court to abstain from exercising our discretionary certiorari jurisdiction in this case coming from a state court, but those concerns simply do not defeat our jurisdiction to hear it nor respondent's standing to litigate it.

[5] The dissent does not argue that the writ should be dismissed as improvidently granted on the ground that this case is an unwise vehicle for adjudicating the constitutional question presented. Cf. *New York* v. *Uplinger*, *ante*, at 249 (STEVENS, J., concurring). Indeed, the dissent is perfectly willing to adjudicate the constitutionality of the statute and is quite confident that it does not violate the First Amendment.

tion for prudential purposes. The fact that Munson has been actually, but indirectly, injured in fact by the effect of the statute on its potential clients is not enough, standing alone, to permit it to litigate the constitutionality of the statute in this Court. The Court properly recognizes that more is required and pinpoints the crucial facts that the "activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents." *Ante,* at 958. Those factors are sufficient to assure us that Munson will vigorously litigate the question in this Court, thus providing this Court with the basis for informed decisionmaking. That is the primary prudential question for this Court in a case coming to us from a state court, which may permit third-party actions for declaratory relief that federal district courts might not necessarily entertain.

### III

Once it is determined that Munson may assert the First Amendment rights of its clients, it follows that Munson may challenge the statute on any ground that they might assert. Munson does not argue that the statute would be unconstitutional as applied to the Fraternal Order of Police, even though on this record a successful challenge on that ground would appear to redress Munson's injury. Instead, it attacks the statute on overbreadth grounds. The fact that this case comes to us from a state court is relevant to our consideration of the merits of the overbreadth challenge to some extent as well. We need not construe the statute for ourselves, compare *post,* at 984, and n. 5; the state court has authoritatively done so. That construction greatly aids an informed analysis of the merits of the First Amendment overbreadth question. The state court's judgment that the illegitimate sweep of the state statute is substantial in relationship to its legitimate applications surely merits serious

consideration by this Court to the extent that issue turns on a quantitative assessment of future applications of the statute.

In summary, while I am persuaded that this Court should have declined to exercise its certiorari jurisdiction in this case—surely it had no business granting certiorari to review the determination that "Munson had standing to challenge the validity of § 103D", see *ante*, at 954—I concur in the Court's opinion.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE O'CONNOR join, dissenting.

Four Terms ago, the Court struck down an ordinance of the Village of Schaumburg, Illinois, which prohibited "the solicitation of contributions by charitable organizations that do not use at least 75 percent of their receipts for 'charitable purposes,' those purposes being defined to exclude solicitation expenses, salaries, overhead, and other administrative expenses." *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 622 (1980). Today, on the authority of that decision, the Court strikes down a markedly different Maryland statute, whose primary and legitimate effect is to prohibit professional fundraisers from charging charities a fee of more than 25% of the amount raised. The Court, invoking the doctrine of "overbreadth," reaches this result not at the behest of any affected charity, but at the behest of a professional fundraising organization. Believing that in this case the overbreadth doctrine is not merely "strong medicine," *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973), but "bad medicine," I dissent.

Recently, this Court reaffirmed its commitment to "[t]he traditional rule" that, except in the rarest circumstances, "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York* v. *Ferber*, 458 U. S. 747,

767 (1982).[1]  This commitment is in keeping with the fact that the courts in our federal system do not have a roving commission "to survey the statute books and pass judgment on laws before the courts are called upon to enforce them." *Younger* v. *Harris*, 401 U. S. 37, 52 (1971).  The Constitutional Convention specifically rejected a proposal to have Members of the Supreme Court render advice concerning pending legislation.  See 1 M. Farrand, Records of the Federal Convention of 1787, p. 21 (1911).  And through the "case or controversy" requirement of Art. III, all federal courts are restricted to the resolution of concrete disputes between the parties before them.  Musings as to possible applications of a statute to third parties in hypothetical situations may be fitting for the classroom and the statehouse, but they are neither wise nor permissible in the courtroom.

The very power of the judiciary to declare a law unconstitutional depends upon a "flesh-and-blood" dispute in which the application of the law comes into conflict with the superior authority of the Constitution.  As Chief Justice Marshall explained in *Marbury* v. *Madison,* 1 Cranch 137, 178 (1803):

> "So if a law be in opposition to the constitution; if both the law and the constitution *apply to a particular case,* so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case.  This is of the very essence of judicial duty."  (Emphasis added.)

The crucial corollary of this justification for judicial review is the principle that constitutional rights are personal and

---

[1] See also *United States* v. *Raines*, 362 U. S. 17, 21 (1960); *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 513 (1937); *Yazoo & M. V. R. Co.* v. *Jackson Vinegar Co.*, 226 U. S. 217, 219–220 (1912); *Supervisors* v. *Stanley*, 105 U. S. 305, 311–315 (1882); *Austin* v. *The Aldermen*, 7 Wall. 694, 698–699 (1869).

may not be asserted vicariously. *McGowan* v. *Maryland*, 366 U. S. 420, 429–430 (1961). When a litigant challenges the constitutionality of a statute, he challenges the statute's application to him. He claims, for example, that his activities, which the statute seeks to regulate, are protected by the First Amendment. If he prevails, the Court invalidates the statute, not *in toto*, but only as applied to those activities. The law is refined by preventing improper applications on a case-by-case basis. In the meantime, the interests underlying the law can still be served by its enforcement within constitutional bounds.

A successful overbreadth challenge, on the other hand, suspends enforcement of a statute entirely. The interests underlying the law, however substantial, are simply negated until the statute is either rewritten by the legislature or "reinterpreted" by an authorized court to serve those interests more narrowly. The litigant is permitted to raise the rights of third parties not before the court in order to forestall even legitimate applications of the law.

The advantages of the first approach are obvious. It is less intrusive on the legislative prerogative and less disruptive of state policy to limit the permitted reach of a statute only on a case-by-case basis. Such restraint also allows state courts the opportunity to construe a law to avoid constitutional infirmities. *New York* v. *Ferber, supra*, at 768. Finally, the decision itself is likely to be more sound when based on data relevant and adequate to an informed judgment. The facts of the case focus and give meaning to the otherwise abstract and amorphous issues the court must decide. "Facts and facts again are decisive." Frankfurter & Landis, A Note on Advisory Opinions, 37 Harv. L. Rev. 1002, 1005 (1924).

One might as a matter of original inquiry question whether an overbreadth challenge should ever be allowed, given that the Declaratory Judgment Act and the availability of preliminary injunctive relief will usually permit a litigant to discover

the scope of constitutional protection afforded his activity without subjecting himself to criminal prosecution. Be that as it may, however, our cases at least indicate that the doctrine is to be used sparingly. "[W]e have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.'" *New York* v. *Ferber, supra,* at 769 (quoting *Broadrick* v. *Oklahoma,* 413 U. S., at 613). We have insisted that the overbreadth of a statute be "substantial" in relation to its legitimate sweep before the statute will be invalidated on its face. "[P]articularly where conduct and not merely speech is involved," *Broadrick, supra,* at 615, we are hesitant to paralyze the legitimate enforcement efforts of the States based solely on predictions as to potential chill.

These considerations apply with special force in this case. The challenged Maryland statute functions primarily as an economic regulation setting a limit on the fees charged by professional fundraisers. The purpose and effect of the statute are, therefore, altogether different from those of the Village ordinance invalidated in *Schaumburg, supra.* Schaumburg's ordinance provided that "[e]very charitable organization, which solicits or intends to solicit contributions from persons in the village by door-to-door solicitation or the use of public streets and public ways, shall prior to such solicitation apply for a permit." Schaumburg Village Code, Ch. 22, Art. III, § 22–20 (1975). The application for that permit was required to contain "[s]atisfactory proof that at least seventy-five per cent of the proceeds of such solicitations will be used directly for the charitable purpose of the organization." § 22–20(g). Excluded from the definition of "charitable purpose" were all solicitation expenses, salaries, overhead, and other administrative expenses. *Ibid.*

Thus, Schaumburg's ordinance was primarily directed at controlling the nature and internal workings of charitable organizations seeking to solicit in the Village, and its prime failing was that it effectively prohibited any solicitation by "organizations that are primarily engaged in research, advo-

cacy, or public education and that use their own paid staff to carry out those functions as well as to solicit financial support." *Schaumburg*, 444 U. S., at 636. Such advocacy organizations are likely to have high administrative expenses which would make it impossible for them to qualify for a permit.

Maryland's statute, on the other hand, is primarily directed at controlling the external, economic relations between charities and professional fundraisers. Such fundraisers are required by § 103F to register with the Secretary, furnish certain information, pay an annual fee, file a bond and, most important of all, comply with the requirements of the subtitle, including § 103D. Section § 103D provides in relevant part:

> "(a) A charitable organization . . . may not pay or agree to pay as expenses in connection with any fundraising activity a total amount in excess of 25 percent of the total gross income raised or received by reason of the fund-raising activity. . . ."

As to Munson and other professional fundraisers who are not themselves engaged in speech activities, § 103D, read in conjunction with § 103F, is merely an economic regulation controlling the fees the firm is permitted to charge. A similar regulation governing, for example, the fees charged by an employment agency would be judged and approved under the minimum rationality standard traditionally applied to economic regulations. See, *e. g.*, *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 460 (1978); *Williamson* v. *Lee Optical Co.*, 348 U. S. 483 (1955). Of course, a ceiling on the fees charged by professional fundraisers may have an incidental and indirect impact on protected expression—as would, for example, a ceiling placed on the fees charged by literary agents—in that marginal producers could be forced out of the market. In other words, price controls might tend to make these services less available, much as rent control is thought to make rental housing less available. But such an indirect

and incidental impact on expression is not sufficient to subject such regulation to strict First Amendment scrutiny. Otherwise, national forest legislation would be equally suspect as tending to raise the price and limit the quantity of paper.

Even if limitations on the fees charged by professional fundraisers were subjected to heightened scrutiny, however, those limitations serve a number of legitimate and substantial governmental interests. They insure that funds solicited from the public for a charitable purpose will not be excessively diverted to private pecuniary gain. In the process, they encourage the public to give by allowing the public to give with confidence that money designed for a charity will be spent on charitable purposes. The legislature could conclude that fees charged by professional fundraisers must be kept within moderate limits to coincide with the contributors' expectations that their contributions will go primarily to the charitable purpose. There is an element of "fraud" in soliciting money "for" a charity when in reality that charity will see only a small fraction of the funds collected.[2] But even if a fundraiser were to fully disclose to every donor that half of the money collected would be used for "expenses," so that there could be no question of "fraud" in the common-law sense of that word, the State's interest is not at an end. The statute, as the Court concedes, is also directed against the incurring of excessive costs in charitable solicitation even where the costs are fully disclosed to both potential donors and the charity. Such a law protects the charities themselves from being overcharged by unscrupulous professional fundraisers.

---

[2] The Court simply misses the point when it dismisses this legitimate interest with the observation that "there is nothing in the percentage limitation that prevents [an organization] from misdirecting funds." *Ante,* at 967. The concern is not that someone may abscond to South America with the funds collected. Rather, a high fundraising fee itself betrays the expectations of the donor who thinks that his money will be used to benefit the charitable purpose in the name of which the money was solicited.

The Court, therefore, is simply mistaken when it claims that "there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits." *Ante*, at 965–966. The rates charged by professional fundraisers are in fact both "easily identifiable" and "constitutionally proscribable." If Maryland's statute regulated only the rates charged by professional fundraisers to charitable organizations, this would be an easy case. The statute would be clearly constitutional.

But of course the statute also applies to solicitation expenses other than those spent on professional fundraisers. To that extent, therefore, the statute directly regulates the solicitation activities of charities and is subject to more intense scrutiny. *Schaumburg, supra,* at 632. Even as applied directly to charities, however, the statute serves legitimate objectives insofar as it regulates fundraising costs not attributable to public education or advocacy. Again, donor confidence is enhanced by such a regulation, and the intended objects of the public's bounty are benefited. The real question before the Court, then, is whether the overbreadth of the statute—the extent to which it might infringe on constitutionally protected expression—is substantial judged in relation to the statute's plainly legitimate sweep. *Broadrick* v. *Oklahoma,* 413 U. S., at 615.

The Court today echoes the concern of *Schaumburg* that some charities will incur fundraising costs higher than the 25% limitation not because the costs are essential to fundraising, but because the charity seeks to raise funds in a manner that serves other educational and advocacy goals. See *ante,* at 963–964. Unlike *Schaumburg,* however, it is not at all clear that the Court's concern is well founded in this case. In baldly claiming that advocacy organizations "remain barred by the statute from carrying on those protected First Amendment activities," *ante,* at 964, the Court simply ignores or slights some crucial differences between this statute and the ordinance at issue in *Schaumburg.*

First of all, administrative and overhead costs that are not attributable to fundraising are not included in the 25% calculation of § 103D(a). Thus, the salaries of researchers, policymakers and technical support staff, as well as general overhead expenses, do not count as fundraising costs. "[O]rganizations that spend large amounts on salaries and administrative expenses," *Schaumburg*, 444 U. S., at 638, will therefore be largely unaffected by the statute. To take but one obviously pertinent example, Citizens for a Better Environment, the plaintiff in *Schaumburg*, reportedly spent 23.3% of its income on fundraising in 1975 and 21.5% on administration. In 1976, these figures were 23.3% and 16.5%, respectively. *Id.*, at 626. Thus, although that organization was prohibited from soliciting door-to-door by the Village ordinance in *Schaumburg*, it would be readily accommodated by Maryland's more carefully drawn statute.

Second, § 103D(b) specifically excludes from the definition of fundraising costs many of the costs associated with combined advocacy and fundraising activities. The section provides:

> "(b) For purposes of this section, the total gross income raised or received shall be adjusted so as not to include contributions received equal to the actual cost to the charitable organization of (1) goods, food, entertainment, or drink sold or provided to the public, nor should these costs be included as fund-raising costs; (2) the actual postage paid to the United States Postal Service and printing expense in connection with the soliciting of contributions, nor should these costs be included as fund-raising costs."

Thus, unlike the ordinance in *Schaumburg*, the costs of receptions, picnics and other social events at which advocacy organizations seek converts are not included in the fund-raising calculus. Nor are costs associated with printing and mailing advocacy literature. Again, the statute is more

carefully designed to accommodate the protected expression of such organizations. Sections 103D(a) and (b) together largely eliminate the concerns of *Schaumburg.*

Third, § 103D(a) directs the Secretary to "issue rules and regulations to permit a charitable organization to pay or agree to pay for expenses in connection with a fund-raising activity more than 25% of its total gross income in those instances where the 25% limitation would effectively prevent the charitable organization from raising contributions." The Maryland Court of Appeals has said that this waiver provision is "extremely narrow," but it should still suffice to alleviate the Court's concern that "unpopular" charities will be precluded from soliciting. *Ante,* at 967. A charity unable to meet the 25% limit due to the unpopularity of its cause would clearly be entitled to a statutory exemption.[3]

Finally, even for those activities which mingle fundraising and advocacy, but do not fall within the exceptions of § 103D(b), § 103D(a) appears to call for a pro rata allocation of expenses into those expenses attributable to the fundraising portion of the activity and those attributable to the advocacy portion.

> "The Secretary of State shall, by rule or regulation in accordance with the 'standard of accounting and fiscal reporting for voluntary health and welfare organizations' provide for the reporting of actual cost, and of allocation of expenses, of a charitable organization into those which

---

[3] The Court itself acknowledges that "[t]he possibility of a waiver may decrease the number of impermissible applications of the statute," but feels that this fact "does nothing to remedy the statute's fundamental defect." *Ante,* at 968. As noted, however, the Court simply ignores the extent to which the statute directly and legitimately regulates both the fees charged by professional fundraisers and those fundraising costs not attributable to public education or advocacy. Properly viewed, any decrease in the number of impermissible applications of the statute is extremely significant as tending to decrease overbreadth in relation to the statute's legitimate sweep.

are in connection with a fund-raising activity and those which are not."

If such a pro rata allocation is required by the statute, then expenses associated with door-to-door solicitation by a member of the organization,[4] which involves advocacy and education as well as an appeal for financial support, could not be charged entirely to fundraising.[5] If that is correct, the statute is not overbroad at all. Expenses associated with advocacy and public education would be completely excluded from the fundraising calculus. The crucial point is that we cannot know precisely how such activities will be accommodated unless we first give Maryland a chance to face the question in concrete situations.

It would be foolish to claim that these four statutory safeguards will ensure that the statute will never be applied in such a way as to improperly inhibit the protected expression of any advocacy organization. No statute bears an absolute guarantee that it will always be applied within constitutional bounds; consequently, no such guarantee can be demanded. The question before the Court, we must remember, is whether the likely overbreadth of the statute is *substantial* in relation to its legitimate sweep.

---

[4] The statute specifically excludes from the definition of professional fundraiser a "bona fide salaried officer or employee of a charitable organization which maintains a permanent office in the State." § 103A(g).

[5] The Court rightly points out, *ante*, at 963, n. 11, that one of the Secretary's regulations provides that any public education activity which includes "an appeal, specific or implied, for financial support, shall be fully allocated to fund-raising expenses." Code of Maryland Regulations § 01.02.04.04A(3) (1983). But that regulation is not necessarily consistent with the statutory scheme. It has yet to be tested and we therefore do not know if it would be upheld by the Maryland courts. At any rate, possible constitutional failings in the regulations passed pursuant to a statute do not form a basis for holding the statute itself unconstitutional. A far less drastic solution would be, in an appropriate case, to strike down the regulation.

The differences noted above between this statute and the ordinance condemned in *Schaumburg* serve to minimize any potential overbreadth.   And given the extensive legitimate application of this statute, both to fundraising expenses not attributable to public education or advocacy and to the fees charged by professional fundraisers who, like Munson, are not themselves engaged in advocating any causes, I see no basis for concluding that the Maryland statute is substantially overbroad.   Nor does the Court offer any reason to so believe.   As noted, the Court simply misunderstands the primary purpose and effect of the statute and then proceeds to speculate about how it might be improperly applied.   Unfortunately, such misunderstanding and ungrounded speculation are the natural hazards of overbreadth analysis.   When the Court's sights are not focused on the actual application of a statute to a specific set of facts, its vision proves sadly deficient.

I dissent.