**NATIONAL BROADCASTING COMPANY, INC., et al., Plaintiffs,**

v.

**Max CLELAND, in his official capacities as Secretary of State of the State of Georgia and Chairman of the State Election Board, et al., Defendants.**

**No. 1:88–CV–320–RHH.**

United States District Court, N.D. Georgia, Atlanta Division.

June 13, 1988.

Matthewa Henry Patton, Judith Ann Powell, Kilpatrick & Cody, Atlanta, Ga., for plaintiffs.

**1206**

Floyd Abrams, Susan Buckley, Cahill Gordon & Reindel, New York City, for defendants.

### ORDER

ROBERT H. HALL, District Judge.

This is an action brought by plaintiffs National Broadcasting Company, Inc. ("NBC"), CBS Inc. ("CBS") and American Broadcasting Companies, Inc. ("ABC") challenging the constitutionality of Ga.Off'l Code Ann. § 21-2-414(a). That section of the Georgia Code makes it a misdemeanor punishable by imprisonment of up to one year or a fine of up to $1,000 or both for any person to "conduct any exit poll or public opinion poll with voters on any primary or election day within 250 feet of any polling place or of the outer edge of any building within which such polling place is established whichever distance is greater." The case is currently before the court on plaintiffs' motion to certify the class of defendants and on crossmotions for summary judgment by each of the parties.

FACTS

A. *Parties*

Plaintiffs NBC, CBS Inc. and ABC each operate a national network and own radio and television stations. The plaintiffs are engaged in the gathering of news, the production of new programming and the transmission of new programming to their affiliated broadcast stations in the State of Georgia and throughout the country.

Defendant Max Cleland is Secretary of State of Georgia. As Secretary of State, Cleland is the chief elections officer of the State of Georgia. As Secretary of State, Cleland is also the chairman of the State Election Board. The State Election Board is charged with the duty to supervise elections conducted in the State of Georgia. Cleland is named in this litigation in his official capacities as Secretary of State and Chairman of the State Election Board.

Defendants Benson Ham, Oscar Persons, Bernard Taylor and Roger F. Kahn are members of the State Election Board and are named in this litigation in their official capacities as members of the State Election Board. As members of the State Election Board, defendants Cleland, Ham, Persons, Taylor and Kahn are charged with the duty to supervise the conduct of elections in Georgia.

Defendants Jesse Spikes, Francis O'Callahan, and Terry Moshier are members of the Fulton County Board of Elections and Registration and are named in this litigation in their official capacities as members of the Fulton County Board. As provided by law, the Fulton County Board acts as the Superintendent of Elections for Fulton County and is charged with the duty to supervise the conduct of primaries and elections throughout Fulton County, to issue rules, regulations and instructions for the guidance of poll officers, and to instruct poll officers in their duties.

B. *Procedural History*

Plaintiffs brought this action on February 17, 1988 and on the same day moved this court for an order preliminarily enjoining defendants from enforcing the challenged statute on "Super Tuesday," the Georgia primary election day, held March 8, 1988. On February 29, 1988, this court held a hearing on plaintiffs' motion from a preliminary injunction. On March 1, 1988, the court granted plaintiffs' motion and enjoined the enforcement of Ga.Off'l Code Ann. § 21-2-414(a) beyond 25 feet of the exit of any building in which a polling place is located. As a result, plaintiffs were permitted to conduct exit polls of voters in Georgia during "Super Tuesday" and reported the information obtained from these polls to the public. As suggested by the court at the conclusion of the hearing, the parties have filed crossmotions for summary judgment on the issue of permanent relief and have stipulated that for purposes of this litigation the facts are as presented at the February 29 hearing.

C. *Georgia Law Regarding the "Polling Place"*

The defendants contend that the State of Georgia has a significant interest in maintaining the sanctity and decorum of the polling place and in encouraging the exer-

cise of the elective franchise. The Constitution of the State of Georgia of 1983, Art. II, § 1 ¶ 1, guarantees election by "secret ballot." This guarantee was added specifically for the purpose of maintaining the sanctity of the polling place by preventing any possible influence on the voter. *Proceeding of the Select Committee on Constitutional Revision, Subcommittee on Elective Franchise Article,* at 21–22; *Proposed Revision of Article II as Recommended by Committee to Revise Article II,* September 29, 1977.

The Supreme Court of Georgia has also espoused this interest. As the Supreme Court stated in *Stiles v. Earnest,* 252 Ga. 260, 312 S.E.2d 337 (1984) (invalidating a referendum where citizens, not election officials, were allowed to "check off" voters from a voter list within 250 feet of the poll):

There is sanctity to elections under our system of self-government, wherein the will of the people—freely voiced and fairly polled—is the supreme law, and that sanctity must be preserved from all assault, witting or no.

252 Ga. at 262, 312 S.E.2d 337.

This concern for maintaining the sanctity of the polling place and encouraging citizens to vote is expressed in Article IX of the Georgia Election Code, Ga.Off'l Code Ann. §§ 21–2–400–414. This article reflects over a half century of state attention to this area. *See, e.g.,* Ga.Laws 1922, pp. 97, *et seq.* The concern was reflected as early as 1922 in a law entitled "An act to provide for a secret and private ballot in all elections held in this State; to make it the duty of certain officials to provide rooms, booths or enclosures, at certain polling places, and to protect the secrecy of and the purity of the ballot ..." Ga.Laws 1922 at 97. This 1922 law was the first to proscribe attempts to influence or interfere with any voter or to engage in disorderly conduct near or at any voting place. Ga.Laws at 97, 103. The law was later amended in 1956 to prohibit, for counties of a certain size, campaigning within 150 feet of any voting place. Ga.Laws 1956 at 333. In 1961, the law was given broader applica-

tion, preventing certain campaign activities within 250 feet of the voting place in any county which could be extended to a greater distance by local legislation. Ga.Laws 1961 at 557.

A codification of the Georgia election laws first occurred in 1964. Ga.Laws 1964, *ex. sess.,* at 26, *et seq.* The immediate statutory forerunner of Ga.Off'l Code Ann. § 21–2–414(a) is found at Code Section 34–1307. Ga.Laws 1964, *ex. sess.,* at 26, 130. This Code section prohibits campaign activities within 250 feet of the polling place, as does present law. The recommendation of the election laws study committee on this section was for a 500 foot prohibition. *Election Laws Study Committee, 1963: Proposed Election Code* (Part II) at 127. A 250 foot limitation was finally settled upon. *Transcript of the Seminar Concerning the Georgia Election Code Conducted by the State Election Board,* August 6–7, 1964 at 1–10, 117–120.

Thus, since the adoption of the 1964 Code, the interest of the State of Georgia in maintaining the sanctity and decorum of the polls has been reflected by a 250 foot zone in which certain activities are restricted.

During its 1985 regular session, the Georgia General Assembly passed and the Hon. Joe Frank Harris, Governor of the State of Georgia, signed into law Act No. 527 amending Ga.Off'l Code Ann. § 21–2–414. As amended § 21–2–414 provides in its entirety:

(a) No person shall solicit votes in any manner or by any means or method, nor shall any person distribute any campaign literature, newspaper, booklet, pamphlet, card, sign, or any other written or printed matter of any kind nor shall any person conduct any exit poll or public opinion poll with voters on any primary or election day within 250 feet of any polling place or of the outer edge of any building within which such polling place is established, whichever distance is greater.

(b) No person shall solicit signatures for any petition on any primary or election day within 250 feet of any polling place

or of the outer edge of any building within which such polling place is established, whichever distance is greater.

(c) This Code section shall not be construed to prohibit a poll officer from distributing materials, as required by law, which are necessary for the purpose of instructing electors or from distributing materials prepared by the Secretary of State which are designed solely for the purpose of encouraging voter participation in the election being conducted.

(d) Any person who violates this Code section shall be guilty of a misdemeanor.

(e) This Code section shall not apply to conduct occurring wholly within any privately owned residence, privately owned business, or privately owned building which is not being used as a polling place.

Ga.Off'l Code Ann. § 21-2-414.[1]

### D. *Evidence Presented at the Hearing*

The State contends that this statute was enacted in reaction to several complaints by voters after the 1984 national election. The Office of Secretary of State received complaints from voters and election officials about the conduct of exit polls. In support, the State cited testimony given at the hearing on the plaintiffs' motion for preliminary injunction held on February 29, 1988. The common thread in all the testimony by the State officials was that the legislature's purpose in enacting the 250-foot ban on exit polls and public opinion polls was to provide a "safe haven" within which voters could vote without interference. The only justification raised for maintaining a 250-foot ban as opposed to some other distance was that other Georgia "poll conduct" statutes precluding other activities on primary or election days had previously employed the 250-foot restriction and the State had consistently sought to create a uniform 250-foot "safe haven".

As regards the specific complaints that provided the impetus to pass the statute, Thomas E. Lawrence, member of the Georgia House of Representatives, testified that

of his experience with a "very aggressive lady" who approached him "right in the area where the ballots were taking place" and attempted to conduct an oral exit poll. Tr. at 86–93. This experience led him to support the Bill.

Former Representative Claude Bray, Chairman for ten years of the House Governmental Affairs Committee, testified that he was contacted by Frances Duncan, Director of the State Elections Division of the Secretary of State's Office, who told him that voters were concerned about exit polling because as they left the polls they would be stopped and interviewed. In representative Bray's opinion, these voters felt this to be an invasion of privacy and that some felt they were obligated to answer and were intimidated. Tr. at 115–119.

Ms. Joy Erlene Clarke, member of the DeKalb County Board of Registration and Elections, testified that after voting in the 1984 primary she was confronted by an exit pollster sitting at a table in the hallway just adjacent to the polling place itself. Tr. at 132. Ms. Clarke testified that the pollster's table blocked most of the hallway and each voter had to pass by the table in order to exit the hallway and then exit the building. *Id.*

Ms. Norma Lyons, Election Supervisor for DeKalb County, testified of voters complaining that the exit poll was an invasion of their privacy and that they perceived exit polling as a form of campaigning. Tr. at 136–137. Additionally, Katherine Gibbs, former Elections Superintendent for Clayton County, testified that during the 1980 general election she received voter complaints from one precinct that "a candidate's name was being tossed around and that could influence a voter in some way." Tr. at 143. She explained that she was concerned that if another voter heard a candidate's name mentioned, the voter might perceive such as a form of electioneering. *Id.*

Lastly, Frances Duncan testified that she had received numerous complaints about exit polls during both the 1984 and 1986

---

**1.** Code section 21-2-2 defines "polling place" as "the room provided in each precinct for voting at a primary or election." Ga.Off'l Code Ann. § 21-2-2.

elections. Tr. at 176–179. She echoed the previous State officials in their concern that the traditional 250–foot zone be maintained, testifying essentially that the 250–foot zone already existed through the function of other statutes and that § 21–2–414(a) merely added another evil to the list of activities precluded by the preexisting statutory scheme. The defendants produced no testimony that less restrictive alternatives were considered or that any official raised the concern that such a ban might impinge on First Amendment rights.

Plaintiffs NBC, CBS and ABC have engaged in journalistic activities, including the conduct of exit polls, within 250 feet of polling places in numerous states throughout the country during primary and general elections. The general term "exit poll" refers to the collecting of data from a random sample of voters at a sample of polling places on primary and general election days. The term is not defined in the statute. Defendants essentially do not dispute this characterization.[2]

In conducting exit polls, plaintiffs' exit pollsters approach voters after they have voted and ask them to complete a short anonymous questionnaire. The questionnaire asks voters for their opinions on issues of the day and how they voted. In addition, the questionnaire requests demographic information. Completing a questionnaire takes only a few minutes.

Plaintiffs use the results of exit polls to analyze how and why people vote, to identify and comment upon social and political trends and to report on the results of elections on election night and thereafter. Warren Mitofsky, Director of the Election and Survey Unit for CBS News, testified that CBS prepares written analyses after each election summarizing what was learned from that election; those materials are then distributed to academics and journalists. Tr. at 42–43. The information gathered from exit polls is also used by elected officials in their study of voting trends and issues.

Dr. Everett C. Ladd, Professor of Political Science and Director of the Institute for Social Inquiry at the University of Connecticut, testified that as a result of the extensive nature of the information available because of exit polling, exit polls have become a valued source of election data among political writers and scholars. Tr. at 76–77. He further testified that estimates of how various groups of Americans voted, and the policy judgments underlying their vote choices, are more reliably made by exit polls than hypothetical future choices or responses given after the voter has been subject to the influence of voting results and other influences. *Id.* Defendants produced some evidence that the more lofty claims regarding exit polling were "overstated", but plaintiffs produced convincing evidence that telephone polls or later contacts do not offer comparable alternatives to exit polling. Tr. at 40–42, 160.[3] Estimates of how various groups of Americans voted, and the policy judgments underlying their voting choices, are made with unique reliability by exit polls in part because exit polls report the preferences of voters before the voter is subject to outside influences. Tr. 40–41; 63–64; 76–77.

Exit polls provide accurate data about voter behavior because of the near certainty that the persons interviewed have actually voted. Plaintiffs produced credible evidence that the greater the distance from the polling place that the reporter is required to stand, the less reliable the information gathered. Plaintiffs' experts explained that as a polling reporter moves farther away from the polling place, the likelihood of a voter getting into his or her car and driving away, or of melding into a crowd of non-voters increases making it harder to differentiate between voters and

---

**2.** Defendants contend that their witness, Dr. John D. Hutcheson, Jr., testified that the term "exit poll" is susceptible to a broader definition; an intercept survey of persons exiting any activity. While technically correct, defendants' argument would not alter the definition of the term relative to an election statute.

**3.** The evidence is in agreement that the crucial information of whether a voter voted and how could not currently be as reliably obtained through a source other than an exit poll.

non-voters. Thus, as the distance increases, the statistical reliability of the sample decreases because it becomes impossible to interview voters in the scientifically selected, random pattern; *e.g.*, every voter, every other voter, every third voter, etc.

Relying on the expert testimony of Mr. Mitofsky, plaintiffs contend that the 250-foot limitation contained in § 21–2–414(a) prohibits plaintiffs from effectively conducting exit polls in the State of Georgia. Tr. at 31–35. Defendants counter that Mr. Mitofsky admitted that it is possible to conduct exit polls on private property and comply with the Georgia distance limit. Tr. at 54. Mr. Mitofsky actually testified on cross-examination that because the 250 foot limitation does not apply to private property, *see* § 21–2–414(e), an exit interview could legally be conducted at such a location. Tr. at 52. Defendants' witness, Dr. Hutcheson, admitted that while it may be possible to conduct an exit poll at that distance, it is "very difficult". Tr. at 162–163.

To conduct exit polls, each of the plaintiffs assign at least one polling reporter to each of the polling places randomly selected for the polls. Polling reporters are clearly identified because they wear sashes, badges, or the like. Plaintiffs' polling reporters are instructed to be courteous and businesslike and not to interfere with the elections process in any way. Because the sample precincts are randomly chosen, it is very unusual for more than one reporter to be at the same precinct at the same time.

## DISCUSSION

### A. *Merits*

The defendants assert, and the court accepts, that the purpose of Code § 21–2–414(a) is "in maintaining the sanctity and decorum of the polling place and in encouraging the exercise of the elective franchise."

The parties in there Statement of Facts Not in Dispute, dispute the meaning of the term "exit poll" as used in the statute. The terms "exit poll" and "exit opinion poll" are not defined in the statute. Plaintiffs produced testimony that the term "exit poll" refers to the collecting of data from a random sample of voters after they have voted at a random sample of voting places on both primary and general election days. Plaintiffs' Ex. 4 at ¶ 4. The State produced testimony that the term includes intercept surveys of persons exiting any activity. Tr. at 147–148, 152. The court finds that plaintiffs' definition is that relevant to the interpretation of the statute.

Plaintiffs contend that section 21–2–414(a) restricts, and indeed criminalizes, plaintiffs' ability to conduct exit polls with individuals in Georgia who have voted and to ask orally or by means of a questionnaire about issues of political import. Although defendants argue that the statute does not involve First Amendment protected activity, the court finds that because it restricts the freedom to speak about elections, government and politics, the statute strikes at the very core of the First Amendment. "[T]here is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966), *quoted in CBS Inc. v. Smith,* 681 F.Supp. 794, 802 (S.D. Fla.1988). *See also Leonard v. City of Columbus,* 705 F.2d 1299, 1304 (11th Cir. 1983), *cert. denied,* 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984) ("[C]ertain types of speech traditionally are accorded greater protection in our society by virtue of the fact that the speech goes to the heart of our democratic processes.")

As the Ninth Circuit found in striking down a statute similar to the one at issue in this case, The media plaintiffs' exit polling constitutes speech protected by the First Amendment both because the information gathered and disseminated by the poll is speech and because the process of obtaining the information requires a short but significant discussion between pollster and voter. *Daily Herald v. Munro,* 838 F.2d 380, 384 (9th Cir.1988); *CBS Inc. v. Smith,* at 802; *Journal Broadcasting, Inc. v. Logsdon,* No. 99–Civ.–0147 (W.D.Ky. March 8, 1988) (temporarily restraining election officials from enforcing Ken-

tucky's electioneering statute to prohibit exit polling; holding that to construe the statute "in such a way as to prohibit all exit polling would violate the first amendment rights" of plaintiff-broadcaster). *See also Clean–Up '84 v. Heinrich,* 759 F.2d 1511, 1513 (11th Cir.1985) (in a challenge to a Florida statute prohibiting solicitation of signatures on petitions within 100 yards of a polling place on election day, the court held that "asking a voter to sign a petition" is protected "speech" and "gathering at the polls to solicit signatures" is protected association.)

The court rejects defendants argument that because the inquiries are achieved by the handing out of a written questionnaire, rather than through oral interviews, the plaintiffs' exit polling constitutes unprotected "conduct". The physical method of collection utilized by the plaintiffs in this case does not open otherwise protected activity to restriction by the State.

### 1. Content–Based Restriction

■ Plaintiffs argue that section 21–2–414(a) is a "content-based" restriction on speech. They contend that the statute limits only the conduct of exit polls and public opinion polls without limiting other expressive and non-expressive activities at or near the polling place. Defendants in response argue that the statute applies even-handedly to the press and public alike. The defendants also argue that there is no restriction on certain subjects; the restrictions apply whether the polling inquiry concerns demographics, voting patterns, sexual preference, or any other subject matter. The court however holds that the statute is "content-based" because it regulates a specific subject matter, the discussion of voting, and a certain category of speakers, exit pollsters. *Daily Herald* 838 F.2d at 385; *see also Consolidated Edison Co. of New York v. Public Service Commission,* 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65

L.Ed.2d 319 (1980); *Widmar v. Vincent,* 454 U.S. 263, 267–70, 102 S.Ct. 269, 273–75, 70 L.Ed.2d 440 (1981).[4]

Regulations which restrain speech on the basis of its content presumptively violate the First Amendment. *Daily Herald* 838 F.2d at 385; *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46–47, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29 (1986); *Carey v. Brown,* 447 U.S. 455, 462–63 n. 7, 100 S.Ct. 2286, 2291–92 n. 7, 65 L.Ed.2d 263 (1980); *Police Department v. Mosley,* 408 U.S. 92, 95, 98–99, 92 S.Ct. 2286, 2289, 2291–92, 33 L.Ed.2d 212 (1972). Such a regulation may be held valid only if it is narrowly tailored to accomplish a compelling government interest. *Daily Herald supra; Consolidated Edison Co.,* 447 U.S. at 540, 100 S.Ct. at 2334.

The court finds that the State's espoused interest in maintaining the sanctity and decorum of the polls and in encouraging the use of the franchise is a compelling one. However, section 21–2–414(a) is not narrowly tailored to promote this interest. Although the evidence at the preliminary injunction hearing indicated that the 250–foot ban on exit polling was enacted to preserve peace and order around the polling place in order not to discourage people from voting, the current statute proscribes all exit polling no matter how unobtrusive and non-disruptive.

The State argues that it prohibited all exit polling because exit polling *intrinsically* invades the privacy of voters and thus disturbs the sanctity and decorum of the polling place. The evidence at the hearing demonstrated to the contrary; however, that the statute was enacted in response to particular complaints about certain disruptive behavior by exit pollsters in and around the polling place and adjacent to the entrance and exit doors of the building within which the polling place was located.[5] The State produced no first-hand

---

**4.** Enforcement of such a statute raises the real specter of requiring those government officials charged with enforcing the statute to monitor the activities of the press and public alike to determine if a "poll" as opposed to merely an

"interview" or informal discussion is taking place.

**5.** The court feels that the evidence at the hearing of voters being approached by exit pollsters within the polling place itself and in the area immediately around the entry and exit doors of

evidence that any voter had ever decided not to vote because of the existence of exit polls, or that such a result was in any way a real danger. Thus, the evidence produced by the State showed that exit polling was not inherently disruptive or obtrusive beyond the curtilage of the building that houses the polling place.

■ To the extent that the State's evidence showed that the statute was enacted so that voters not be "bothered" by the orderly, non-disruptive taking of an exit poll, many pronouncements by the Supreme Court indicate that such a justification may not constitutionally serve as the basis for a statute. In *Boos v. Barry,* — U.S. —, —, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988) the Court recently held that "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate "breathing space" to the freedoms protected by the First Amendment.'" (quoting *Hustler Magazine v. Falwell,* — U.S. —, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988)). In *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 210, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975) the Court stated that "the Constitution does not permit government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *See also Cohen v. California,* 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971) ("[T]he mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense.")

Additionally, plaintiffs have demonstrated that section 21–2–414(a) is duplicative of several Georgia statutes enacted precisely to preserve the sanctity of the polling place. Less restrictive means already

the building containing the polling place showed that the conduct of an exit poll could be a deterrent to voting and could be disruptive in causing confusion as to the identity of the state election officials and the exit pollsters. The court feels that the placement of an exit pollster in such close proximity to the poll or the exit and entry doors provides the voter very little opportunity to exercise his or her constitutional right to refuse to participate in the exit poll.

available to the State include Code § 21–2–413(d) which prohibits "electioneering" within the polling place. Code § 21–2–413(e) restricts access to the "enclosed space" inside the building housing the polling place to voters and authorized officials. Indeed, numerous other statutory provisions ensure peace, order, and decorum of the polls. *See* Ga.Off'l Code Ann. §§ 21–1–1 (campaign posters); 21–2–408 (activities of poll watchers); 21–2–566 (interference with poll officer or election); 21–2–567 (intimidation of voters); 21–2–568 (interference with voting process); 21–2–569 (interference with poll officer); 21–2–570 (buying/selling votes); 21–2–579 (fraudulent pre-voting display of intended vote or ballot); and 21–2–597 (intentional interference with others' election duties). *See Daily Herald,* 838 F.2d at 385.

To the extent that the evidence showed that the conducting of past exit polls may have disrupted administration of the polling place, the disturbances mentioned in the record would have been prohibited by enforcement of these other Georgia statutory provisions. For example, the testimony of an "aggressive" women asking questions a few steps away from the voting booth is proscribed by § 21–2–413(e) (proscribing activities within the polling place) as the witness, Thomas E. Lawrence, Jr., a member of the Georgia House of Representatives, admitted.[6]

Lastly, the evidence showed that the State did not consider other effective, less restrictive alternatives. For example, regarding the State's concern of confusion between the exit pollsters and election officials, the State might have required more explicit definition of the identities of exit pollsters. Likewise, with regard to the concern that exit polling discourages exer-

6. This discussion by the court is in no way intended to indicate that the use of these statutes to prohibit exit polling would be permissible. *See Journal Broadcasting, Inc. v. Logsdon,* No. 88–Civ.–0147 (W.D.Ky. March 8, 1988) (temporarily restraining election officials from enforcing Kentucky's electioneering statute to prohibit exit polling).

cise of the elective franchise, the State might inform voters that they need not answer some or all of an interviewer's questions. More simply, the State might have reduced the size of the restricted area consonant with the complaints it received. It could have required separate entrances and exits and required exit pollsters to stand outside the exit area.[7] Thus, the court finds that the statute is not narrowly-tailored to accomplish the permissible goal of maintaining the sanctity and decorum of the polling place and encouraging the elective franchise.

### 2. Overbreadth

■ Somewhat related to plaintiffs' contention that the statute is not narrowly-tailored to accomplish its goal and that less restrictive means are available, is plaintiffs' assertion that the statute is "overbroad". Facial invalidity on account of overbreadth exists where is seeks to prohibit such a broad range of protected activity that there is a realistic danger that the statute will significantly compromise recognized first amendment protections of parties not before the court. *Clean–Up '84 v. Heinrich,* 759 F.2d at 1513. Here, the statute is overbroad in that it prohibits orderly administration of non-disruptive exit polling as well as disruptive activity. *See e.g., Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 967–68, 104 S.Ct. 2839, 2852–53, 81 L.Ed.2d 786 (1984) (where "a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech,

the statute is properly subject to facial attack.")

### 3. *Saxbe* and *Pell*

■ The State, in a variation of its argument that the activity of exit polling does not constitute protected speech, contends that this is an "access" case implicating no First Amendment interest. In support, the State cites the cases of *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) and *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974). *Saxbe* and *Pell* involved suits by journalists and inmates challenging a flat ban on interviews with inmates while in prison. These cases are often cited for the "hornbook" proposition that the press' right to access extends no further than that of the general public. More accurately, these cases stand for the proposition that the Constitution imposes no affirmative duty upon government to make available to journalists sources of information not available to members of the public generally. *See Pell,* 417 U.S. at 834–35, 94 S.Ct. at 2810–11; *Saxbe,* 417 U.S. at 850, 94 S.Ct. at 2815.

The court believes that because, as explained above, the statute at issue here targets one form of speech for prohibition, this case does not fall within the doctrinal category of "access" cases.[8] Nevertheless, when viewed even under the broadest reading of *Saxbe* and *Pell,* access in this case is not denied to all as in the prison context. It is available to all but a few—exit pollsters. Under the statute, journalists may enter the 250–foot zone, take pictures and even interview willing voters so long as no poll is taken. Tr. at 186.[9] Discussions

---

7. The court expresses no opinion about the constitutionality of the above-mentioned methods, but rather mentions these methods by way of illustrating that less restrictive alternatives exist to the 250–foot limit.

8. *Pell* by its own terms limits its applicability beyond the prison context in that case in light of the ample alternatives to direct journalist-prisoner interviews, including by mail and permission to visit with family, friends, attorneys and clergy, the court stated:

> We would find the availability of such alternatives unimpressive if they were submitted as justification for governmental restriction of personal communication among members of the general public."
417 U.S. at 822, 94 S.Ct. at 2804.

9. The plain language of the statute indicates that only exit polls and public opinion polls are prohibited by its terms. At the hearing, Frances Duncan, the Director of the State Elections Division, took the untenable position that *any* interview was prohibited under Georgia law on the

between voters or between voters and non-voters may also take places as long as they do not constitute campaigning. Thus, the media plaintiffs do not seek "special access to information not shared by members of the public generally." *Pell* 417 U.S. at 834, 94 S.Ct. at 2810.

■ Moreover, the Supreme Court has indicated that outside the limited context of prisoner interviews, the State's ability to interfere with newsgathering is severely limited. In *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), in reversing a courtroom closing by a state trial judge, the Court stated:

> "It is not crucial whether we describe the right to attend criminal trials to hear, see and communicate observations concerning then as a 'right of access,' cf. *Gannett [Co., Inc. v. DePasquale,] supra* [443 U.S. 368,] at 397, [99 S.Ct. 2898, at 2914, 61 L.Ed.2d 608 (1979)] (Powell, J., concurring); *Saxbe v. Washington Post Co.,* 417 U.S. 843, [94 S.Ct. 2811, 41 L.Ed. 2d 514] (1974); *Pell v. Procunier,* 417 U.S. 817, [94 S.Ct. 2800, 41 L.Ed.2d 495] (1974), or a 'right to gather information,' for we have recognized that 'without some protection for seeking out the news, freedom of the press could be eviscerated.' *Branzburg v. Hayes,* 408 U.S. 665, 681, [92 S.Ct. 2646, 2656, 33 L.Ed.2d 626] (1972)."

*Id.* at 576, 100 S.Ct. at 2827. A footnote in that case indicates that *"Procunier* and *Saxbe* are distinguishable in the sense that they were concerned with penal institutions which, by definition, are not 'open' public places. Penal institutions do not share the long tradition of openness...." *Id.* at 576 n. 11, 100 S.Ct. at 2827 n. 11. (plurality opinion by Burger, C.J.)

In further support, defendants cite *United States v. Anderson,* 799 F.2d 1438 (11th Cir.1986), which concerned the right of the press to access certain information filed in a criminal case. In that case, the court cited *Branzburg* for the proposition that

the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public general. The Eleventh Circuit also cited *Pell* for this general proposition. Based on this citation, defendants argue that the Eleventh Circuit recognizes the validity of *Pell* beyond the prison context. Even assuming the accuracy of this characterization of *Anderson,* that case dealt with access to criminal discovery materials not available to the public or the press. In the case at bar, the information sought is at the core of the First Amendment's protection of political speech. As this court has already found that the statute here involves a "content-based" restriction of speech, the court has had no reason to analyze whether the 250–foot zone is a "public forum" under a "time, place and manner" analysis. Suffice it to say that regardless of any other statutory restrictions on activity within the 250–foot zone on election day, beyond the building containing the polling place itself, the 250–foot zone under the other Georgia "poll conduct" statutes does not involve the type of restricted access typical of the criminal discovery process or of a prison. Therefore, *Saxbe* and *Pell* are distinguishable from the case at bar.

■ Even if the "access"-type analysis were applicable, the court notes that in the more analogous situation of post-trial access to juror interviews, the right to gather news cannot be restricted unless it is narrowly tailored to the purpose. *In re Express–News Corp.,* 695 F.2d 807, 808 (5th Cir.1982). The court has already ruled that the statute cannot survive this test. In those cases involving protection of the integrity of jury involvement in the judicial process, courts have held that trial court orders preventing the media from interviewing jurors regarding their verdicts and deliberations violate the First Amendment rights of the press and of the jurors themselves. *See e.g., In re Express News supra; Journal Publishing Co. v. Mecham,*

theory that an interview was a form of campaigning. Tr. at 183–85. The court finds that nothing in the statutory scheme of poll control

bars basic journalistic activity within the 250–foot zone, but outside the building housing the polling place itself.

801 F.2d 1233 (10th Cir.1986); *United States v. Sherman,* 581 F.2d 1358 (9th Cir. 1978). These courts have observed, however, that the right to gather news is not absolute and that the accused's Sixth Amendment right to a fair trial must be safeguarded. Accordingly "[t]he media must respect the decorum of the courtroom"; and "jurors, even after completing their duty, are entitled to privacy and to protection against harassment." 695 F.2d at 809–10.

### 4. Permissible Restriction

■ The court in its March 2, 1988 order granting a preliminary injunction found that the evidence presented demonstrated that a ban on exit polling prohibiting any exit poll or public opinion poll within the interior of the building in which the "polling place" is located and within 25 feet of the exit of such a building, would likely satisfy even the most rigorous constitutional scrutiny. The court enjoined the function of the statute beyond this 25 foot limit.

At the hearing, the media plaintiffs did not dispute that the State may constitutionally limit activity inside the polling place to voting. Counsel for the plaintiffs summed up the evidence as citing no specific example of "any alleged difficulty with exit polling or exit pollers which did not occur within the building or on the very immediate outside of the building." Tr. at 195. The evidence did show that exit polling inside or immediately outside the doors of the building housing the polling place could cause confusion as to the identity of election officials and had even obstructed voters from entering and leaving the building. The court finds that even when conducted in an orderly manner, the taking of an exit poll within the building housing the polling place and within 25 feet from the exit of such a building impermissibly interferes with voters' exercise of their elective franchise. In that area the State's compelling interest in preserving the sanctity and decorum of the polls and in encouraging the

franchise outweighs any interest of the press and public in conducting an exit poll. Under the legal principles discussed above and the evidence produced at the hearing, the court finds that a 25–foot limit withstands constitutional scrutiny.

The court gives Code section 21–2–414(a) a narrowing construction and permanently enjoins the enforcement of the statute beyond 25 feet of the exit of any building in which a polling place is located. *Cf. Boos v. Barry, supra* —— U.S. at ——, 108 S.Ct. at 1167. (approving a narrowing construction of a statute and reiterating the standard that employing a narrowing construction in interpreting a state statute is appropriate where such a construction is reasonable and readily apparent).

### B. *Class Certification*

■ Plaintiffs have moved this court to certify the class of defendants. The proposed defendant class is comprised of all county Superintendents of Elections, who plaintiffs contend are responsible for ensuring that the primary and election laws are not violated. Ga.Off'l Code Ann. § 21–2–70. The county defendants, who are named by plaintiffs as the class representatives and are the subject of the motion to certify, contend that they are not vested with the responsibility to enforce this statute. The state defendants have filed a response stating the view that they take no position on the issue.[10]

The term Superintendent is defined by statute as the "judge of the probate court of a county or the county board of elections if a county has such." Ga.Off'l Code Ann. § 21–2–2(30). A county board of elections has the powers and duties of a Superintendent. Ga.Off'l Code Ann. § 21–2–40(a). The General Assembly may also create a joint board of elections and registration. Ga.Off'l Code Ann. § 21–2–40(b).

Superintendents specifically have the power to appoint poll and other subordinate

---

**10.** The plaintiffs and the class defendants filed a stipulation on June 9, 1988 stipulating that the court may make a determination regarding class certification based on the pleadings, briefs, and other papers already filed in this case, as well as the entire record, and that no hearing will be necessary.

officers; to make rules deemed necessary to guide those running primaries and elections; and to ensure that primaries and elections are "honestly, efficiently, and uniformly conducted." Ga.Off'l Code Ann. § 21–2–70(6)–(8). Under Georgia law, it is the State Election Board's duty to report election and primary law violations to the appropriate district attorney for prosecution. Ga.Off'l Code Ann. § 21–2–31(a)(5). The Board also has the power to institute legal action to see that the election laws are adhered to, and such actions are filed in the Superior Court of the county of residence of the relevant Superintendent. Ga. Off'l Code Ann. § 21–2–32.

The class consists of individual Superintendents, including Boards of Elections and Registration acting as Superintendents, for the 159 counties in Georgia. It is the Superintendents who supervise the election and primary process on a local level and ensure compliance with Georgia's election laws. See, e.g., Op.Att'y Gen.Ga. 82–41 (1982) (empowering probate judges, when acting as Superintendents, to issue rules barring statutorily restricted activities within 250 feet of a polling place.)

Rule 23, Fed.R.Civ.P. controls the propriety of class certification in this case. Rule 23(b) provides that an action may be maintained as a class action if four prerequisites of Rule 23(a) and any one of the requirements of Rule 23(b) are satisfied. Rule 23(a) provides that one or more members of a class may be sued as representative parties on behalf of a defendant class only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the defenses of the representative parties are typical of the defenses of the class and (4) the representative parties will fairly and adequately protect the interest for the class.

The defendant class consists of the Superintendents of Elections for each county in Georgia. There are 159 Superintendents of Elections dispersed throughout the state, which plaintiffs argue make joinder of all members of the class impracticable. The court believes that the size of the class satisfies the numerosity requirement of Rule 23(a)(1) as that provision has been interpreted by courts in cases involving a proposed defendant class of county sheriffs or similar state officials. See, e.g., Clean-Up '84 v. Heinrich, 582 F.Supp. 125 (M.D. Fla.1984) (certifying defendant class of Florida sheriffs in suit seeking injunctive relief enjoining enforcement of Fla.Stat. § 104.36, which banned the solicitation of voter signatures or opinions within 300 feet of polling places); Florida Businessmen For Free Enterprise v. Florida, 499 F.Supp. 346 (N.D.Fla.1980), aff'd sub nom., Florida Businessmen For Free Enterprise v. City of Hollywood, 673 F.2d 1213 (11th Cir.1982) (certifying defendant classes of 67 Florida sheriffs and state attorneys in suit seeking injunctive relief enjoining enforcement of Florida's "Head Shop" law); see also Brown v. Vance, 637 F.2d 272 (5th Cir.1981) (certifying defendant class of all Mississippi justices of the peace); Marcera v. Chinlund, 595 F.2d 1231 (2d Cir.1979), vacated on other grounds sub nom., Lombard v. Marcera, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979) (defendant class of sheriffs of 43 counties is sufficiently large to meet numerosity requirement for class actions).

Secondly, plaintiffs' action raises one significant question of law—whether the prohibition against the conduct of exit polls or opinion polls within 250 feet of polling places in Georgia as set forth in Ga.Off'l Code Ann. § 21–2–414(a) is violative of the United States Constitution. That question is common to the entire defendant class satisfying the requirement of Rule 23(a)(2). See, e.g., Florida Businessmen, supra 499 F.Supp. at 350 n. 3 (holding that the commonality requirement was satisfied because "[t]here is one question of law, and it is common to all members of the class.")

Thirdly, Plaintiffs' action names the members of the Fulton County Board of Elections and Registration ("Fulton County Board"), acting as the Fulton County Superintendent of Elections, as the representative parties for the defendant class. The Fulton County Board, like every other county Superintendent of Elections, is charged with the enforcement of the Georgia election laws and has the non-discretionary obligation of ensuring that the election laws are upheld. Any defenses assert-

ed by the members of the Fulton County Board as the class representatives will be typical of the defenses of the defendant class. Thus, the requirement of Rule 23(a)(3) is met. *See Clean–Up '84, supra* 582 F.Supp. at 127 (defendant class of sheriffs are "nominal parties" that cannot "argue either for or against the validity of a state statute which by law they are sworn to enforce until or unless enjoined from doing so by lawful authority."); *Florida Businessmen, supra* 499 F.Supp. at 350 n. 3 (certifying defendant classes of sheriffs and state attorneys having the same statutory duties).

Lastly, the class representative named in plaintiffs' action is empowered with the same election law enforcement and oversight functions as every other county Superintendent of Elections in the State of Georgia. Because the Fulton County Board has the same duties and responsibilities as all other county Superintendents of Elections, the Fulton County Board, as class representative, can fairly and adequately protect the interests of the defendant class of Superintendents. As stated in *Marcera v. Chinlund, supra* 595 F.2d at 1239:

> Rule 23(a)(4) does not require a willing representative by merely an adequate one. It will often be true that, merely by protecting his own interests, a named defendant will be protecting the class. Where, as here, the legal issues as to liability are entirely common to members of the defendant class, there is little reason to fear unfairness to absentees.

*See also Clean–Up '84, supra* 582 F.Supp. at 127 ("all Florida sheriffs are actively in concert and participat[e] on a daily basis with defendant [class representative] Heinrich in enforcing the state's laws."); *Kane v. Fortson,* 369 F.Supp. 1342 (N.D.Ga.1873) (in suit challenging the constitutionality of sections of the Georgia elections laws, defendant members of one county board of registrars held to be adequate class representatives of all members of county boards of registrars).

The court now turns to whether plaintiffs' action satisfies one of the requirements of Rule 23(b). The court holds that the action is properly maintainable as a class action under Rule 23(b)(1)(A), Fed.R. Civ.P. Rule 23(b)(1)(A) requires that:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class. . . .

There are 159 county Superintendents of Elections in Georgia and prosecution of separate actions against individual members of the defendant class would create a serious risk of inconsistent or varied adjudications with respect to individual members of the class and would establish incompatible standards of conduct for plaintiffs. The court believes that such a result would be at odds with the policies underlying Rule 23. *See* Louisell and Hazard, *Pleading and Procedure: State and Federal* 719 (1962) (*quoted* in Notes of Advisory Committee On Rules, Fed.R.Civ.P. 23). In the alternative, plaintiffs' action is properly brought as a class action under Rule 23(b)(2) in that the relief plaintiffs seek is identical as to each member of the defendant class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. *See Doss v. Long,* 93 F.R.D. 112, 119 (N.D.Ga.1981) ("[I]t is now settled that 23(b)(2) is an appropriate vehicle for injunctive relief against a class of local public officials.") (quoting *Marcera v. Chinlund, supra* 595 F.2d at 1238).

CONCLUSION

In summary, the court GRANTS plaintiffs' motion for summary judgement, DENIES defendants' motion for summary judgment and GRANTS plaintiffs' motion to certify the class. By this order, the court permanently enjoins the operation of Ga.Off'l Code Ann. § 21–2–414(a) beyond 25 feet of the exit of any building in which a "polling place" is located.

SO ORDERED.