481 F.Supp.2d 1122 (2007)
S.O.C., INC.; and Richard Soranno; Plaintiffs, and
American Civil Liberties Union of Nevada, Intervenor,
v.
COUNTY OF CLARK, State of NEVADA; and Las Vegas Metropolitan Police Department, Defendants, and
Nevada Resort Association; Flamingo Hilton Corporation; and Circus Circus Enterprises, Inc.; Intervenors.
Hillsboro Enterprises, Inc., Plaintiff, and
American Civil Liberties Union of Nevada, Intervenor,
v.
County of Clark; Lorraine Hunt; Myrna Williams; Erin Kenny; Bruce Woodbury; Yvonne Atkinson Gates; Lance Malone; and Mary Kincaid, Defendants, and
Nevada Resort Association; Flamingo Hilton Corporation; Circus Circus Enterprises, Inc.; and Las Vegas Convention and Visitors Authority, Intervenors.
Nos. 2:97-cv-0123-LDG-RJJ, 2:97-cv-0146-LDG-RJJ.
United States District Court, D. Nevada.
March 13, 2007.
*1123 *1124 Dominic Gentile, Gentile DePalma, Ltd., Las Vegas, NV, Clyde DeWitt, Weston, Garrou, DeWitt & Walters, Los Angeles, CA, Cal Potter, III, Potter Law Offices, Las Vegas, NV, JoNell Thomas, Law Office of JoNell Thomas, Las Vegas, NV, Randall J. Roske, Law Office of Randall J. Roske, Las Vegas, NV, for Plaintiffs.
Robert J. Gower, Clark County District Attorney's Office, Civil Division, Las Vegas, NV, for Defendants.
Allen Lichtenstein, ACLU of Nevada, Las Vegas, NV, for American Civil, Liberties Union of Nevada.
John A. Godfrey, Schreck Brignone, Las Vegas, NV, Paul E. Larsen, Lionel, Sawyer & Collins, Las Vegas, NV, Todd L. Bice, Brownstein Hyatt Farber Schreck, Las Vegas, NV, for Circus Circus Enterprises Inc., Mirage Casino-Hotel, and Nevada Resort Association.
Douglass A. Mitchell, Boies Schiller & Flexner, LLP, Las Vegas, NV, for Las Vegas Convention & Visitors Authority.

ORDER
GEORGE, District Judge.
This is Clark County's and intervenor defendants' repeated attempt to advance an ordinance which prohibits off-premise distribution of materials in areas surrounding the Las Vegas "Strip" and the Las Vegas Convention Center (collectively, the "resort district"), including the distribution by plaintiffs of leaflets that advertise erotic dance entertainment services ("outcall services"). Previously, in S.O.C, Inc. v. County of Clark, 152 F.3d 1136 (9th Cir.), amended, 160 F.3d 541 (9th Cir. 1998)(S.O.C), the Ninth Circuit Court of Appeals ruled that the original Clark County Ordinance 16.12, which prohibited speech that "propose[d][a] commercial transaction," was overbroad. The S.O.C. court noted, among other deficiencies, that the ordinance did not use any, limiting language such as "solely," "exclusively" or "primarily," to identify the commercial speech to be regulated as "speech which does no more than propose a commercial transaction." 152 F.3d at 1143-44 (citations omitted).
*1125 Rather than seek further review of the S.O.C. decision, or focus on enacting a time, place and manner regulation, Clark County latched onto the Ninth Circuit's use of the word "primarily" in amending 16.12 to reach only speech "primarily" proposing a commercial transaction. Clark County Ordinance 16.12(5) currently provides:
"Off-premises canvassing" means repetitively distributing, or offering, on public sidewalks, handbills, flyers or other printed or written materials which primarily proposes a commercial transaction. The meaning of "primarily proposes a commercial transaction" is intended to be coextensive with commercial speech standards applied by Central Hudson Gas & Electric Corp. v. Public Service Comm'n, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) and its progeny.
Plaintiffs and intervenor plaintiff American Civil Liberties Union of Nevada (the "ACLUN") sought to enjoin 16.12 as amended (hereafter "the ordinance"), and the court issued a preliminary injunction. The court determined that the ordinance did not correct the overbreadth defect identified by S.O.C. After the Ninth Circuit declined to review the issuance of the preliminary injunction as an interlocutory order, the court conducted a bench trial on the following principal issues: (1) whether the ACLUN and plaintiffs Hillsboro, Soranno and S.O.C. had standing to challenge the ordinance, and (2) whether the ordinance is substantially overbroad or vague.[1] The following decision shall be construed as findings of fact and conclusions of law.
I. The ACLUN's Standing
The S.O.C. court reversed this court's denial of a preliminary injunction of the enforcement of former 16.12 based on an overbreadth claim brought by the ACLUN, although that claim was never properly presented to this court. In its opinion, the S.O.C. court determined that "[b]ecause the ACLUN's claims `are rooted in the First Amendment' the ACLUN has standing to challenge the impact of the Clark County ordinance as it relates to its own expressive activities, as well as those of others." Id. at 1143 (citing Perry v. Los Angeles Police Dept., 121 F.3d 1365, 1368 (9th Cir.1997)).
The Clark County defendants and intervenor defendants (collectively "defendants") argue that despite the Ninth Circuit's previous ruling on the ACLUN's standing, the ACLUN has the burden to show that "the Ordinance has caused it to refrain from any activities whatsoever, let alone activities covered by the Ordinance." Admittedly, the current ordinance differs from former 16.12, which was reviewed by the S.O.C. court, in that it identifies the reach of the ordinance to be materials that "primarily" propose a commercial transaction. But, the S.O.C. court's standing analysis, which was based simply on the ACLUN's claims being "rooted" in the First Amendment, would appear to remain undisturbed by the changes to 16.12's language. In any event, even if the court were to find that the S.O.C. court's holding did not control the question of the ACLUN's standing in the context of the ordinance, and considered the issue anew, the court's standing determination would be no different.
The requirements of Article III standing are well-established: "[A] plaintiff must show (1) it has suffered an `injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not *1126 conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In the First Amendment context, "it is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." American Civil Liberties Union of Nevada v. Heller, 378 F.3d 979, 983 (9th Cir. 2004). Furthermore, plaintiffs need not suffer or risk suffering prosecution under a statute to demonstrate injury from it. Culinary Workers Union, Local 226 v. Del Papa, 200 F.3d 614, 617-18 (9th Cir. 1999). Instead, plaintiffs may meet the standing requirement if they "have been threatened with prosecution, [if] a prosecution is likely, or even [if] a prosecution is remotely possible." Id. at 618.
At trial, the executive director of the ACLUN, Gary Peck, testified on direct examination that the ACLUN is a public, non-profit, public interest, tax-deductible charitable organization whose principal mission is to defend the Constitution and the Bill of Rights. Peck testified that, pursuant to that mission, the organization through its members and volunteers distributes its own publications within the resort district. These publications include its own newsletter containing information about local and national ACLUN activities, and a variety of solicitations for membership and donations which could also contain offers for the sale of message-containing merchandise. During his testimony, Peck offered as a representative sample of the ACLUN's publications (1) a membership solicitation flier containing information about the ACLU's program and a request for donations, (2) an ACLU pledge card soliciting membership and donations, (3) ACLUN's newsletters published in the Fall of 2002 and 2003. Peck testified that he has handed out these specific documents in the resort district (except for the 2003 newsletter), or similar kinds of materials, or they have been distributed by other ACLUN members. Peck stated that the ACLUN intended to distribute similar materials in the future.
Peck further testified that in their mission function, members of the ACLUN also assisted in distributing written materials in the resort district for other organizations and causes, including homeless advocates, antiwar activists, labor union interests, religious groups, and environmental interests, among others. Significantly, Peck testified that the ACLUN has received many calls from groups representing such interests as antiwar, homeless advocacy, environmental, Native American rights, animal rights, labor, and religious organizations, who claim to have been "harassed" by either private security or the Las Vegas Metropolitan Police Department when they attempted to distribute materials in the resort corridor. The court allowed Peck to explain on rebuttal that his intervention in this sort of conflict was most often requested by political or religious groups distributing materials containing controversial messages. According to Peck, he has been told by security and police that it is illegal to distribute the materials in the area, or that the sidewalks are private property and that the individuals or groups have no right to be there. In addition, Peck testified that he and other ACLUN members have been threatened with arrest for insisting on the right to pass out literature in the resort district. Peck stated that if the preliminary injunction barring enforcement of the ordinance is lifted, he would be concerned about sending ACLUN members *1127 to the resort district to participate in these activities for fear that they would be cited, arrested or harassed. With regard to interpreting the ordinance, Peck testified that it was "incomprehensible" because he had no idea what "primarily proposes a commercial transaction" means.
In defendants' cross-examination of Peck, defendants drew out that Peck did not consider the pledge card to be commercial speech, and understood the newsletters and membership solicitations to propose a transaction in the sense that in return for becoming a member, associational opportunities and certain privileges would be conferred. Peck also responded that the membership solicitation indicated that part of the membership dues paid for subscription to the newsletter. Peck testified that the newsletters had been passed out at specific locations in the resort district between 2002 and 2004. In answer to defendants' questioning regarding the alleged "harassment" by police, Peck explained that there had been disagreements between himself and the police regarding whether the ordinance had been enjoined and leafleting permitted, that Peck worked with the undersheriff of the Metropolitan Police Department to draft a directive clarifying the status of the ordinance. Upon further questioning, Peck also indicated that in his encounters with police, police cited "ordinances" or "laws" that prohibited handing out such literature, thereby interpreting, the laws or ordinances to reach the ACLUN materials. While Peck could not identify the specific police officers who had confronted him or other ACLUN members, he offered to name the police officers at the command level whom he had dealt with regarding the issue. Peck also claimed that he had discussed with the ACLUN's attorney whether to seek a contempt citation from the court for the police department's alleged violation of the preliminary injunction, but never formally sought such measures.
Based on Peck's testimony, the court finds that the ACLUN has shown that it has suffered an injury-in-fact. Peck's unrebutted testimony is that he and other ACLUN members were advised that laws and ordinances banned the distribution of literature in the resort district, and were threatened with arrest. This apparent application of 16.12 affects not only the ACLUN's distribution of its own literature, but also its assistance of other organizations in the distribution of materials protected by the First Amendment. While Peck testified that the newsletters and membership solicitations were distributed in 2002 and 2003, that material was submitted as a representative sample. Peck also testified that similar materials were passed out during a time period when 16.12 was not enjoined, which would have been a time period before the enactment of 16.12, as amended.
During trial, defendants sought to establish that the materials distributed by the ACLUN were not commercial speech under the statute, and therefore, the ACLUN had no standing to assert an injury to its First Amendment rights. Indeed, "because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about characteristics and costs of goods and services, it is not treated as a variety of purely commercial speech." Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). The ACLUN is an exempt charity, and therefore its publications soliciting donations or contributions (and likely its membership solicitations) would not be characterized as proposing a commercial transaction. Nor would the ACLUN's advertising for the sale of message-containing merchandise or membership *1128 solicitations involve a primary concern to inform private economic decisions. However, defendants' concentration on whether the ordinance causes injury to the ACLUN's First Amendment rights fails to give a full account of the concept of injury in fact.
Although an overbreadth challenge does not eliminate the requirement that the plaintiff demonstrate its own cognizable injury in fact, that injury does not have to occur to the plaintiff's own First Amendment rights. In Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), the Supreme Court explained:
Facial challenges to the overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society  to prevent the statute from chilling the First Amendment rights of other parties not before the court. Munson's ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake. The crucial issues are whether Munson satisfies the requirement of "injury in fact," and whether it can be expected satisfactorily to frame the issues in the case.
Id. at 958, 104 S.Ct. 2839.
In Munson, the Supreme Court considered a facial challenge to a Maryland statute that prohibited charitable organizations from paying or agreeing to pay expenses exceeding 25% of an amount raised in a fund-raising activity. Munson, a professional for-profit fund-raising company, brought a facial challenge under the First and Fourteenth Amendments. Munson had entered contracts that called for payment in excess of 25% of funds raised for a given event, and the Secretary of State informed Munson it would be prosecuted upon failure to comply with the statue. In addition, a potential client of Munson's had expressed reluctance to enter a contract with Munson because of the statute's limitation. The Supreme Court recognized these as injuries to Munson even though it was not a charity and did not claim that its own First Amendment rights had or would be violated by the statute. Id. at 955, 104 S.Ct. 2839.
In like manner, the ACLUN has suffered injury even though its own First Amendment rights may not have been at stake under certain interpretations of the ordinance. Although the ACLUN's publications arguably do not fall within the commercial-transaction definition of the ordinance, ACLUN members have been informed by police that no literature may be distributed legally in the resort district and have been threatened with arrest. In addition, the ACLUN's function in assisting other organizations and causes in defense of their First Amendment rights has suffered an injury in fact. ACLUN members have been confronted by police while assisting non-charity organizations in pamphleting, and on numerous occasions Peck has been called to intercede in the disputes between police and members of organizations and causes regarding the legality of distributing materials in the resort district. Peck testified that these confrontations so concerned him that he would not send ACLUN staff to the resort district in their previous capacities.
In American Civil Liberties Union of Nevada v. Heller, the Ninth Circuit ruled that the ACLUN and its director alleged a concrete and particularized injury stemming from a Nevada statute requiring election candidates or sponsors of ballot questions to identify on any published material or information supporting an election candidate or ballot question that publication's financial sponsor(s). In that case, the ACLUN alleged that "[it] and its members have been involved with various *1129 groups who have in the past, and plan in the future, to circulate petitions" in the election, process, and that "[it] and its members will continue to be forced to choose to self-censor. concerning past and present matters, but also those that will inevitably arise in the future." 378 F.3d at 984. While Heller involved a different regulation than the ordinance at hand, the alleged chilling effect upon the ACLUN's activities with other groups circulating petitions was recognized as satisfying the requirement of a concrete and particularized injury. Id.
Under the circumstances of this case, the ACLUN has shown a concrete and particularized injury to its legally protected interests. Defendants urge that because one of the ACLUN's stated purposes is to defend the First Amendment rights of other individuals and organizations, any such activities cannot run afoul of the ordinance because the ACLUN is a charitable organization. That position overreaches, however. Not all activities of an organization fall under commercial speech classification merely because the organization solicits donations on its own behalf as a charitable entity. In this case, the ACLUN's non-expressive activities are directly impacted when it diverts personnel and resources to intervene in pamphleting disputes. See id. And, in any event, the ACLUN's non-expressive activities do not fit into the ordinance's definition of off-premise canvassing.
Furthermore, the ACLUN has established that the injury has been both actual and imminent. The ordinance has been invoked against the ACLUN, and there is a credible threat that the ordinance will be invoked against the ACLUN in the future. The ACLUN has been threatened with prosecution, and even if prosecution were not likely, it would remain at least a remote possibility. The injury can also be fairly traced to the challenged action, since the confrontations, warnings and threats to the ACLUN and the individuals and organizations it assists stem from application of the ordinance. Finally, the ACLUN's injury would be redressed by a favorable decision, in this case, since a judicial determination that the ordinance is overbroad would result in the ordinance's unenforceability, and remove the basis for future conflict with authorities. Accordingly, the ACLUN has standing to assert a First Amendment challenge premised, on the ordinance's overbreadth.
Based on ACLU's standing to challenge the ordinance's overbreadth, and the disposition on the merits, the court declines to address at this time plaintiffs S.O.C.'s, Hillsboro's, or Richard Sorrano's standing.[2]
II. Overbreadth
Overbreadth and vagueness are distinct, if somewhat related constitutional doctrines. Overbreadth analysis looks to whether a law "sweeps within its ambit (protected) activities" as well as unprotected ones, Thornhill v. Alabama, 310 U.S. 88, 97, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), while vagueness deals with whether a statute is sufficiently clear so as not to cause persons "of common intelligence . . . necessarily [to] guess at its meaning and [to] differ as to its application." United States v. Wunsch, 84 F.3d 1110, 1119 (9th Cir. 1996).
In considering the ordinance's possible restraint on protected speech interests, *1130 the court is confronted at the start with the meaning of the phrase, "primarily proposes a commercial transaction." Dictionaries variously define "primarily" in reference to a temporal sequence, such as first or original, or in a proportional or qualitative sense, such as principally, fundamentally, or essentially. Webster's Third International Dictionary; The Oxford English Dictionary. "Propose" is commonly defined as "to put forth," "to offer for consideration or acceptance," "to propound," or "to intend." Id. Plaintiffs' witness, English Professor John Irsfeld, proposed that "primarily" carries temporal, quantitative, or qualitative meaning. However, since the ordinance would reach material distributed on a public sidewalk that proposes a single commercial transaction, the court discounts a temporal, or sequential connotation of "primarily."
Whether "primarily proposes" should be read to apply a proportional test with reference to the commercial and noncommercial content of the material, or whether the standard would evaluate the predominant commercial versus noncommercial motives of the speaker is not so easily resolved. Because the ordinance speaks of the material, rather than the speaker, as "primarily propos[ing] a commercial transaction," it suggests a proportional measurement of content, over a motivational focus. In fact, the, ordinance eliminates the reference to material "distributed with an economic motivation of commercial gain" that was included in the original 16.12.
On the other hand, defendants have taken care not to intimate that the commercial speech classification depends on a base proportion of advertising content, although percentages would be a factor. At the time the ordinance was being discussed at hearings before the Clark County Commission, counsel for the County stated, "[t]he idea is, what's the primary purpose of the publication. And you can get into specifics in terms of percentages or the types. . . . [T]he fewer the editorials, the more easily it is to say [that it is commercial speech]." Clark County Commission Meeting, May 4, 1999. In the end, defendants insist that any question about the meaning of "primarily proposes a commercial transaction" is satisfied by the ordinance's instruction that "[t]he meaning of `primarily proposes a commercial transaction' is intended to be coextensive with commercial speech standards applied by Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) and its progeny."
Defendants argue that the "primarily proposes a commercial transaction" test is the very definition of commercial speech, Defendants' Trial Brief at 9. However, this court is unaware that any single definition of commercial speech ever has been set forth by the Supreme Court. Even the Village of Schaumburg case cited by defendants as support for their definition of commercial speech does not use the exact phrase "primarily proposes a commercial transaction." Rather, in the Village of Schaumburg, the Supreme Court explained that "because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services it has not been dealt within our cases as a variety of purely commercial speech." 444 U.S. at 632, 100 S.Ct. 826.
Applying a test that eliminates charitable solicitations from commercial speech scrutiny because they are not primarily concerned with providing information about characteristics and costs of goods is a far cry from providing a statutory definition of commercial speech, however. A judicial review of whether materials constitute commercial or noncommercial speech *1131 is often conducted by a court considering the protection available for speech outside of the context of any statutory definition. Such a legal approach does not necessarily have cross-application in formulating a statute which must be tested under the appropriate scrutiny for the speech that it reaches, and for the sufficiency of its notice of proscribed conduct. The argument that the ordinance regulates only commercial speech as the ordinance defines it ("primarily proposing a commercial transaction") is thus circular and only as valid as the legal accuracy of the actual definition.
The accuracy of the ordinance's definition is placed in doubt when it is compared with Supreme Court and Ninth Circuit precedent. The Supreme Court has identified the question of whether materials or speakers are primarily concerned with providing information about the characteristics and costs of goods as just one facet in identifying commercial speech. In Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Supreme Court held that, to determine whether speech is commercial, courts should consider whether (1) the speech is an advertisement, (2) the speech refers to a specific product or service, and (3) the speaker has an economic motivation for the speech. Id. at 66-67, 103 S.Ct. 2875. Even then, the combination of all of these characteristics would not be determinative, but they would provide strong support for the conclusion that the speech was commercial. Id. at 67, 103 S.Ct. 2875. The Bolger court went on to state:
[T]he mere fact that [materials] are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech. Similarly, the reference to a specific product does not by itself render the [material] commercial speech. Finally, the fact that [the speaker] has an economic motivation for [distributing the material] would clearly be insufficient by itself to turn the materials into commercial speech.
Id. at 66-67, 103 S.Ct. 2875 (citations omitted). See also S.O.C. at 1143 n. 8 (recognizing characteristics of commercial speech identified by Bolger). The ordinance, therefore, is flawed to the extent that it makes the "primarily proposes a commercial transaction" test the single determinative factor in designating all commercial speech.
The ordinance's definition of commercial speech further leads to the ordinance's failure because it continues to sweep into its ambit protected speech, as it did the original version of 16.12. While Clark County took a cue from S.O.C. in adding the concept of "primarily propos[ing] a commercial transaction" to the ordinance, it simply did not go far enough. The problem is illustrated by the distinction made by the S.O.C. court between the definition of commercial speech, and whether the ordinance made exceptions for inextricably-intertwined protected forms of communication. In its overbreadth analysis, the S.O.C. court noted that "the Ordinance's plain language does not limit the scope of the regulated activity to purely commercial expression." 152 F.3d at 1143. According to the S.O.C. court, the Supreme Court has reiterated that "the core notion of commercial speech" is identified as "speech which does `no more than propose a commercial transaction.'" Id. (citing Bolger, 463 U.S. at 66, 103 S.Ct. 2875). It is at this point that the S.O.C. court explains that 16.12 did not use any limiting language, such as "solely," "exclusively" or "primarily." 152 F.3d at 1143-44. The court chose not to elaborate on how such limiting language should be translated into a definition of purely commercial speech, such as the ordinance attempts to provide. But, it did make clear that any definition of commercial speech is statutorily insufficient if it does not spell out the core notion *1132 of commercial speech in a way that identifies the speech as that which does "no more than propose a commercial transaction." Id.
In its revisions of 16.12, Clark County sought to avert the inextricably-intertwined speech problem by attempting not to address the ordinance's failure to "limit its restrictions to purely commercial speech," see id. at 1144, but by defining commercial speech to sweep in fully protected speech altogether. Defendants argue:
Indeed, when non-commercial speech is "inextricably intertwined" with commercial speech, a document is deemed to be "non-commercial." Obviously, if the non-commercial speech is "inextricably intertwined," then the speech at issue does not "primarily propose a commercial transaction" and the Ordinance does not even apply. Clark County was careful to draft an Ordinance that by definition does not go beyond the realm of commercial speech. By reaching only materials that "primarily propose a commercial transaction," the Ordinance does not reach any speech which is fully protected, including speech which is "inextricably intertwined" with commercial speech.
Defendants' and Intervenor Defendants' Motion for Summary Judgment, # 109 at 18; see also Defendants' and Intervenor Defendants' Trial Brief, # 148 at 10-11.
The problem is that this approach does not accomplish a sufficient de-linkage of commercial speech from commercial speech inextricably intertwined with protected speech as identified by the S.O.C. court. The ordinance still does not expressly provide exceptions for inextricably-intertwined speech, and just because commercial and expressive parts of speech are inextricably intertwined does not mean that the totality of such speech "primarily proposes a commercial transaction." The question is not whether, as defendants suggest, the definition of commercial speech includes fully protected speech; such a construct would not stand as a definition of commercial speech at all. Rather, the question is whether the speech which primarily proposes a commercial transaction is all the speech that would be reached by the ordinance. Since, by its very nature, fully protected speech which is inextricably intertwined with commercial speech cannot be "parceled out," 152. F.3d at 1144 (citing Perry, 121 F.3d at 1368), the ordinance reaches fully protected speech as well. See also Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 796, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("[E]ven assuming, without deciding, that such speech in the abstract is indeed merely `commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech").
The distinction between determining whether speech is primarily expressive or commercial, and whether the commercial part of speech is inextricably intertwined with the expressive speech has been made recently by the Ninth Circuit. See United States v. Schiff, 379 F.3d 621, 627 (9th Cir.2004), cert. denied, ___ U.S. ___, 126 S.Ct. 334, 163 L.Ed.2d 46 (2005). The Schiff court discussed two previous intellectual property cases in which the court held that "the new works were primarily expressive, and, to the extent they included commercial aspects, the commercial speech was `inextricably intertwined' with the expressive speech and could not be enjoined." Id. (citing Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180 (9th Cir. 2001)). Schiff is on par with this case in that the material to be regulated was considered primarily commercial. However, Schiff's First Amendment analysis did not stop at what was considered commercial. It went on to address whether purely expressive *1133 content also contained in the materials was inextricably intertwined with the commercial content, and concluded that it was not. 379 F.3d at 629. Here, defendants argue that the ordinance's definition of commercial speech effectively subsumes the inextricably-intertwined analysis. The court must reject the argument for such a merger.
In this case, despite the transformed definition of "off-premises canvassing" to identify a certain class of commercial proposal, the ordinance still reaches the distribution of newspapers, pamphlets, magazines, and other publications that primarily contain commercial advertising, even if the noncommercial content is unrelated to the advertising copy. It still would prohibit "the distribution of a newspaper that stresses social, political, and environmental issues if the paper's production costs were covered by revenue generated from advertisements" and, as this court has also previously emphasized, "a religious organization's newsletter that contained advertisements for its members' business." In the absence of a definition of commercial speech that reaches materials that propose nothing more than a commercial transaction or, without exceptions for inextricably-intertwined speech, the ordinance suffers from the same overbreadth deficiencies as its predecessor.
Defendants argue that plaintiffs have made no showing that the ordinance is "substantially" overbroad. "Substantial overbreadth" is a criterion that the courts invoke to avoid striking down a statute on its face simply because of the possibility that it might be applied in an unconstitutional manner. Munson, 467 U.S. at 964, 104 S.Ct. 2839.
Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court  those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid. A statute maybe invalidated on its face, however, only if the overbreadth is "substantial." The requirement that the overbreadth be substantial arose from our recognition that application of the overbreadth doctrine is, "manifestly, strong medicine," and that "there must be a realistic danger" that the statue itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.
Board of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (internal quotations omitted). See also Broadrick v. Oklahoma, 413 U.S. 601, 610-13, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (challenged law must be "realistically" and "substantially" overbroad).
However, the Supreme Court has held that substantial overbreadth may also exist when "there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits," or when the application of the statute "operates on a fundamentally mistaken premise." Munson, 467 U.S. at 965, 104 S.Ct. 2839. Both situations apply here: the ordinance fails to distinguish between commercial speech and commercial speech inextricably intertwined with protected speech and the ordinance operates to impair as commercial speech the protected-speech component of inextricably-intertwined speech.
In addressing whether the ordinance is realistically and substantially overbroad, the court also takes into account the S.O.C. court's pronouncements. The S.O.C. court *1134 held that "an overbreadth challenge to [16.12 as previously written] is appropriate" because the ordinance "reaches beyond purely commercial speech to regulate fully protected speech that is `inextricably intertwined' with commercial speech." 152 F.3d at 1143 n. 6. As discussed above, all that essentially has changed with the amendment of 16.12 is the introduction of the "primarily proposes" test for determining whether material falls within the scope of the ordinance. The new definition, however, does not do the job of narrowing the amount of inextricably-intertwined forms of speech to take it outside of the overbreadth ruling of the S.O.C. court. That is, certain inextricably-intertwined speech identified by S.O.C. would still exist under the ordinance because the ordinance fails to identify the key notion of commercial speech; that is, that it does "no more than propose a commercial transaction." Id. at 1143. The way that "primarily" is used in the ordinance simply is not the definitional equivalent of that notion.
Even outside of S.O.C.'s direction, the court would be compelled to conclude that the ordinance remains realistically and substantially overbroad. The overbreadth analysis requires the court to examine the ordinance with a view toward predicting, hypothetically, its restriction of protected speech. Broadrick, 413 U.S. at 612, 93 S.Ct. 2908 (overbreadth analysis requires "a judicial prediction or assumption"); see also Coates v. Cincinnati, 402 U.S. 611, 616, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (finding law overbroad without benefit of factual record). That assessment also must be made "in relation to the statute's plainly legitimate sweep." Hill v. Colorado, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).
Here, considering the expansive size of the resort district regulated, the high volume of pedestrian movement within that environment, and the ordinance's specific aim at distribution of materials on public sidewalks, it is highly probable that the ordinance will realistically reach a substantial amount of material containing inextricably-intertwined protected speech, even if those materials were deemed commercial under the various interpretations of "primarily proposes a commercial transaction." Furthermore, the legitimate sweep of the ordinance, aimed at improving and protecting the pedestrian environment, supports the conclusion of a foreseeable and substantial impact on protected speech. Accordingly, the ordinance is substantially overbroad in that it violates the First and Fourteenth Amendments to the Constitution by impermissibly restricting protected expression within the resort district.
III. Vagueness
A law can be unconstitutionally vague, and void, if (1) it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, or (2) it authorizes or even encourages arbitrary and discriminatory enforcement. Hill, 530 U.S. at 732, 120 S.Ct. 2480. However, courts must not play the game of "conjur[ing] up hypothetical cases in which the meaning of . . . terms will be in nice question . . . because we are `condemned to the use of words, [and] can never expect mathematical certainty from our language.'" Id. at 733, 120 S.Ct. 2480.
The ordinance falls short of providing a clear and meaningful definition of the material it reaches. The phrase "primarily proposes a commercial transaction" can be interpreted as referring either to the predominant content of the material, or the principal motivation for the distribution of the material. Since the "materials" are identified as that which primarily proposes a commercial transaction, rather than the "speakers," the terminology *1135 would appear to suggest a percentage or proportion of advertising to protected speech. However, proponents of the ordinance have argued against a purely quantitative test in favor of determining the speech's "purpose." In any event, this ambiguity is displaced by the ordinance's explication that "[t]he meaning of `primarily proposes a commercial transition' is intended to be coextensive with commercial speech standards applied by Central Hudson Gas & Elec. Corp. v. Public Service Comm'n, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) and its progeny."
"If a judicial explication makes a statute clear, so that fair notice is afforded, vagueness may not be imputed." United States v. Fithian, 452 F.2d 505, 506 n. 1 (9th Cir.1971). However, such a construction must be consistently applied by the courts, and must provide clear notice of its application. See United States v. Wise, 550 F.2d 1180, 1187 (9th Cir.1977). Furthermore, federal courts are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." Heller, 378 F.3d at 986.
Here, the ordinance's appeal to the entirety of post-Central Hudson commercial speech law to provide the meaning of the phrase "primarily proposes a commercial transaction" fails to give fair notice to a person of average intelligence of the ordinance's application. It substitutes whatever meaning a literal reading of the ordinance would offer with a complicated body of precedent that not only fails to clearly or consistently interpret the concept of "primarily proposes a commercial transaction," but never even addresses the exact wording of the phrase. As evident by testimony at trial, the ordinance's imposed legal study of the expansive and complex concept of commercial speech has generated ample confusion among both speakers and law enforcement alike. The ordinance, therefore, falls short of the clarity required by the Constitution.
IV. Conclusion
Based on the foregoing, the court finds that the American Civil Liberties Union of Nevada has standing to challenge Clark County Ordinance 16.12. The court further finds that Clark County Ordinance 16.12 is substantially overbroad and vague. Finally, the court finds that the newsrack system is not an effective substitute for the variety and scope of handbilling that takes place in the resort district, and that defendants have raised insufficient facts or arguments to justify the ordinance under valid time, place and manner regulation of fully protected speech. Accordingly,
THE COURT HEREBY DECLARES that Clark County Ordinance 16.12 is unconstitutional on its face.
THE COURT FURTHER ORDERS that the enforcement of Clark County Ordinance 16.12 is PERMANENTLY ENJOINED.
THE COURT FURTHER ORDERS that the ACLUN's motion requesting status conference (# 175) is DENIED as moot.

JUDGMENT
This matter having come before the court in a trial on the merits, and the court having rendered its decision in favor of intervenor plaintiff American Civil Liberties Union of Nevada on its constitutional challenge of Clark County Ordinance 16.12, therefore,
THE COURT HEREBY ORDERS that judgment is ENTERED in favor of plaintiff American Civil Liberties Union of Nevada and against defendants and intervenor defendants.
NOTES
[1] Although the court previously indicated that post-trial briefing would be in order, upon a review of the record and trial briefs, the court finds further briefing to be unnecessary within the context of the issues addressed in this ruling.
[2] Defendants attempted to show at trial that plaintiffs S.O.C., Soranno and Hillsboro lack standing to assert First Amendment protection of their outcall services because their outcall businesses are actually fronts for illegal prostitution, and the pamphlets are misleading.